# Exhibit 19

# LIONBRIDGE

STATE OF NEW YORK                    )
                                     )          ss
                                     )
COUNTY OF NEW YORK                   )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Danish into English of the attached document U.1997.762H. I

affirm that the linguist responsible for producing this translation is fluent in both the Danish and

English languages.

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _3_ day of _JUNE_, 20 _22_.

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023

**U.1997.762H**

**H.D. March 20, 1997 in Case no. II 42/1994**

*The Danish Bankers Association (Finance Denmark), acting on behalf of Administrationsselskabet af . April 2, 1990 A/S (formerly Idé-Banken A/S and EPA Bank A/S) (represented by attorney-at-law Jon Stokholm, Copenhagen)*

v.

*Fondsbørsvekselerer L. Pedersen I/S in bankruptcy, represented by the trustees in bankruptcy, attorneys-at-law Pernille Bigaard, Peter Bøgelund og Steen Klein (attorney-at-law Steen Klein, Copenhagen),*

*Agreements 5.2 Ownership right 2.1 Finances, etc. 2*

**Buyer of foreign stock, which was deposited into the stockbroker firm's collective securities account, and secured creditor to the company's bankruptcy estate.**

♦ The stockbroker firm V purchased Portuguese EFACEC stock on behalf of the bank B in 1987. V made the purchase through the English brokerage firm A, and the stock was deposited into the collective securities account it kept with a Portuguese bank. V was registered as owner of the shares with A, and V's securities account with A also contained EFACEC shares that belonged to other clients of V. In June 1988, V was declared bankrupt, and a dispute arose as to whether B, as a secured creditor, was entitled to have the stock surrendered to it. At the time of purchase, the stock had become B's property, cf. Section 53, Paragraph 2 of the Danish Commercial Agents Act. At all events, in a case such as this one, where V's collective securities account with A did not contain EFACEC shares that belonged to V itself, the fact that B's shares were held in a securities account together with EFACEC shares that belonged to other clients, without an indication of who these shares belonged to, was not decisive for B's right to claim its ownership right with regard to the bankruptcy estate. B's shares could be picked out in accordance with V's reliable bookkeeping, cf., in this connection, Section 6, Paragraphs 3 and 4 of the Danish Securities Trading Act.1 The case was settled in the same way for some Spanish stock that had been deposited into V's collective securities account with a Spanish bank. Before the High Court, B set out the principal claim that the bank had been entitled to cancel the purchases and set off against the repayment claim. However, this claim was not repeated before the Supreme Court.

## The High Court of Eastern Denmark

### Judgment of the High Court of Eastern Denmark of December 16, 1993 (Seventh Chamber),

(Vagn Rasmussen, K. Wiingaard and Ina Steincke).

This case concerns the position of the buyer of the stock in relation to the stockbroker's estate in bankruptcy, where the buyer's stock is kept together with other stock with a third party.

During the proceedings brought on September 21, 1990, the Plaintiff, Fondsbørsvekselerer L. Pedersen I/S in bankruptcy, represented by the trustees, attorneys-at-law Pernille Bigaard, Peter Bøgelund and Steen Klein has claimed, in accordance with its last argument, that the Defendant, EPA Bank A/S, formerly Idé-Banken A/S, should be sentenced to pay DKK 632,425.50 or, alternatively, a smaller amount, as determined by the Court, with the addition of the maximum deposit

interest on DKK 601,550.88 applicable at any time from August 5, 1988 and on DKK 30,874.62 from October 17, 1988, until the commencement of proceedings and from this point on, with the addition of the statutory interest on such amounts.

In the alternative, the Plaintiff has argued that the Defendant should be sentenced, as set out in the overall claims laid out above; however, in exchange for the handover of the securities in the estate registered in the Defendant's name, with the addition of the proceeds received in the course of the administration of the estate.

The Defendant has argued for acquittal in exchange for the payment of the principal amount of DKK 21,683,85 or, in the alternative, an amount as determined by the court that does not exceed DKK 330,577.02 or, in the further alternative, an amount that does not exceed DKK 458,393.79 — in exchange for the handover of 500 EFACEC shares and 133 Amper shares and payment of the proceeds received in the course of the bankruptcy proceedings — and, in the yet further alternative, only in exchange for the payment of not more than DKK 458,393.79, and in all cases, with the addition of the usual statutory interest from the commencement of proceedings.

In summary, the background to the case is that the Defendant acquired a number of Portuguese and Spanish shares and paid the purchase price through the subsequently bankrupt stockbroker firm. The securities were held abroad together with stock that belonged to other clients. The Defendant sought to resell the shares, but this was only partially successful. The Defendant set off the purchase price along with interest thereon after the bankruptcy.

The following details are clear:

Fondsbørsvekselerer L. Pedersen I/S assisted the Defendant with the acquisition and sale of foreign stock and securities. Moreover, the Defendant secured loans for the operation of the stockbroker firm.

In July and September-October 1987, respectively, the Defendant purchased, with the assistance of Fondsbørsvekselerer L. Pedersen

**763**

I/S, 133 Spanish shares designated as AC. Amper Abr 87 and a total of 1,200 Portuguese shares designated as EFACEC-Emp Fabril de Maquinas Elec. Broker's notes were exchanged, confirming that the securities were purchased from Fondsbørsvekselerer L. Pedersen I/S and sold to the Defendant, respectively.

Attempts were subsequently made to divest the shares.

In this connection, a copy of an order book, which was continually kept by Fondsbørsvekselerer L. Pedersen I/S, has been presented in order to shed light on the sequence of events. The book is handwritten and contains succinct notes, including symbols, mainly in chronological order. Based on the information provided in the course of the proceedings, the following conclusions may be drawn from the contents of the book:

On November 11, 1987 at 10:30 a.m., the Defendant's employee, Claus Jensen, telephoned Fondsbørsvekselerer L. Pedersen I/S and requested, among other things, the sale of all 1,200 EFACEC shares. Later that day, an employee of Fondsbørsvekselerer L. Pedersen I/S made the following note in the book:

"Not ready for sale yet!" On the very same day, at 3:55 p.m., this employee had another telephone call with Claus Jensen, who canceled the order. The parties agreed that Fondsbørsvekselerer L. Pedersen I/S would give notice to the Defendant once delivery was possible.

On December 2, 1987 at 10:25 a.m., another of the Defendant's employees, Bjarne Bering, requested that the EFACEC shares be sold "in the best way possible." As regards trading in the Portuguese shares, Fondsbørsvekselerer L. Pedersen I/S entered into correspondence with a UK broker, Ark Securities. On the same day, at 11:40 a.m., the employee at Fondsbørsvekselerer L. Pedersen I/S had a telephone conversation with a certain employee at Ark Securities. The EFACEC shares were not sold at that time.

On December 18, 1987, the Defendant sent the following letter to Fondsbørsvekselerer L. Pedersen I/S:

"With reference to various telephone conversations regarding the sale of the following shares:

..."

---

**I** RT 1916-17, A sp. 2972 f, 3040 ff, FT 1995-96, L 71 s. 42 f, U 1927.21 H, U 1928.11 H, U 1929.702 H, U 1959.688 V, U 1985.849 SH, U 1985.856

SH, U 1994.719 Ø, Lassen: Obligationsrettens Specielle Del (4. ed. 1931) p. 325 ff, Illum: Tingsret (3 ed. 1976) p. 184 f, Carstensen: Ting og sager (1982) p. 76 ff, Munch: Konkursloven (7. ed. 1993) p. 281 f and Ruben Andersen in Justitia 1995, no. 3 p. 1 ff.

... 1,300 EFACEC

...

133 Amper,

we hereby confirm our desire to have these sold as soon as possible. If the shares above, contrary to our expectations, are not sold by December 31, 1987, we reserve the right to sell the shares to you at the prices quoted on December 3, 1987."

There is agreement that the specified number of EFAFEC shares should rightfully be 1,200.

The order book further indicates that on January 26 1988, at 9:05 a.m., the employee at Fondsbørsvekselerer L. Pedersen I/S asked the employee Bjarne Bering if the Defendant wanted a "limit" in connection with the order dated December 2, 1987, The question was answered in the negative.

On January 27, 1988, at 9:30 a.m., the employee at Fondsbørsvekselerer L. Pedersen I/S had a new conversation with the respective employee at Ark Securities. The entry in the book reads, as follows:

"He claims that he has not received the orders of December 2, 1987. This is an outright lie, but this does not pose a problem since the shares have not been prepared for sale. ... We will fax the order again ... Nevertheless, Ark would like to set a limit."

A limit was then defined at 9:53 a.m. in consultation with the Defendant's employee, Bjarne Bering. The EFAFEC shares were put up for sale with the stipulated limit. At 10:50 a.m., the order was sent by telefax to Ark Securities. The stock was not sold.

The sales order was repeated in vain on February 1 and 2, 1988.

On April 20, 1988, at 1:37 p.m., an employee of the Defendant requested the sale of the EFAFEC stock with the previously set limit, and this request was confirmed on the same day by the Defendant's employee Claus Jensen.

A total of 700 EFAFEC shares were sold successfully. On May 3, 1988, Fondsbørsvekselerer L. Pedersen I/S sent the Defendant a provisional settlement of PTE 3,749,552 and added that

"The final settlement will be forwarded as soon as we receive the settlement from Portugal."

Finally, the order book indicates that Claus Jensen requested the sale of the remaining 500 EFAFEC shares at 1:30 p.m. on May 9, 1988.

A loan agreement was signed by and between Fondsbørsvekselerer L. Pedersen I/S and the Defendant as lender on June 13, 1988. The agreement was an extension of a current loan. The agreement indicates that the loan stands at DKK 5 million. As security, Fondsbørsvekselerer L. Pedersen I/S was to provide the securities the

partnership kept in two subsequently specified collective securities accounts.

The "General Terms and Conditions" for the loan stipulate that:

"4. a. The pledge shall serve as security for the indemnified payment of capital, interest, commission, legal expenses as well as other expenditure incurred in connection with the recovery of the debt pursuant to this loan agreement.

b. The pledge also serves as security for any other liability that the pledger has now or may have against the bank ...

8. a.

The bank is entitled to sell all pledged assets, as well as anything that may come into their place, with 8 days' notice and in the manner the bank deems expedient, including also by means of direct sale.

..."

On June 21, 1988, Fondsbørsvekselerer L. Pedersen I/S entered into bankruptcy proceedings.

**764**

The Plaintiff found that the respective EFAFEC and Amper shares had not been repatriated but were held in custody with foreign financial institutions. The Plaintiff's books contained detailed records of clients, including the Defendant, as owners of foreign securities, yet the client relationship with the Defendant had not been registered with the respective foreign financial institution. Thus, no sub-account had been noted down for the Defendant.

On June 24, 1988, the Defendant canceled the loan of June 13, 1988 and warned that it would sell the assets that had been deposited as security.

As mentioned in the preliminary settlement of May 3, 1988 from Fondsbørsvekselerer L. Pedersen I/S, a settlement from the sale of 700 EFAFEC shares was expected from Portugal. The settlement was first made after the bankruptcy date. The Plaintiff confirmed by broker's note of July 1988 that they had bought the shares for PTE 3,749,552.03, which amount corresponded to DKK 174,031.71. As a result of the bankruptcy, this amount was not paid out to the Defendant.

The amount stemming from the sale of the assets that had been deposited as collateral by Fondsbørsvekselerer L. Pedersen I/S was transferred to a collateral account with the Defendant on July 20, 1988. The presented statements of account indicate that the deposits yielded varied variable interest at the rates of 6 and 7½%.

On August 5, 1988, the Defendant wrote the following to the Plaintiff:

"*Set-off statement.*

As a result of your failure to hand over the mentioned EFAFEC shares, these transactions are hereby reversed.

Our receivables in this relationship are computed, as follows:

| | | |
|---|---|---|
| ... purchase, value date 10/7/87, of 200 x ... | DKK | 110,488.70 |
| whereof 13% interest for 302 days | DKK | 11,884.35 |
| ... purchase, value date 9/29/87, of 300 x ... | DKK | 137,900.89 |
| whereof 13% interest for 310 days | DKK | 15,225.77 |
| ... purchase, value date 9/29/87, of 700 x ... | DKK | 293,631.08 |
| whereof 13% interest for 310 days | DKK | 32,420.09 |

... This gives a total amount, incl. interest, of DKK 601,550.88 that we have set off against L. Pedersen's receivables to Idé-Banken.

..."

The Defendant performed the set-off on the same day by making an entry to the said collateral account.

On August 17, 1988, the Defendant wrote the following to the Plaintiff:

"You were supposed to have handed over 133 AC AMPER shares to us under the enclosed sale note. Since this has not happened yet, and since we, unlike the EFAFEC shares, cf. our letter dated August 5,

1988, know that the shares in question must be in your possession, we kindly us you to arrange for these shares to be transferred to ABN-Bank in Madrid ... within 14 days.

If the shares are not transferred within the deadline above, we will make a set-off for an amount corresponding to the market value of the AC AMPER shares as of the set-off date."

By letter dated August 25, 1988, the Plaintiff objected to the set-off that had been performed and announced, as detailed in the Defendant's letters of August 5 and 17, respectively.

On October 17, 1988, the Defendant announced that "... we have received a set-off for DKK 30,874.62, corresponding to the amount of the AC AMPER stock as of 10/13/88, which has not been received, cf. our letter of 8/17/88."

The Defendant performed the set-off by adjusting an amount that had simultaneously been forwarded by the Defendant in order to settle the total outstanding accounts between the parties.

The parties agree that the amount of DKK 30,874.62 is wrong and that the market value as of July 15, 1987 of DKK 9,190.77 should be used as a basis.

In a letter of October 23, 1990, Ark Securities have answered certain questions put forward by the Plaintiff's attorney-at-law. The answer contains a list of the shares that the UK company held in custody for Fondsborsvekselerer L. Pedersen I/S as of July 31, 1988.

It further reads:

"Question 1: "What kind of instructions did Ark Securities receive from L. Pedersen with regard to the purchases in question?"

Answer: ...Pedersen gave us purchase and sales instructions over the telephone. On account of Pedersen's approach, starting from January 15, 1988, we insisted on getting written instructions. All transactions were made for L. Pedersen alone, and we designated the account as "L. Pedersen, foreign currency account" for tax purposes in the UK.

Question 2: "Has Ark Securities received any sales orders for the aforementioned securities?"

Answer: We have not received any executable orders to sell the shares in question.

We were aware that Pedersen wanted to sell some or all of the shares, but this was not possible for two main reasons:

a) Since the settlement system in Portugal had suffered a breakdown, there were tremendous delays in the handover of certain shares to our securities account, and shares could first be sold once they had been handed over.

b) After the stock market collapse in October 1987, it was only possible to sell very small quantities at something resembling realistic prices.

It was against our advice that Pedersen gave sales orders without limits about rate and magnitude that exceeded market volume. Starting from January 15...they appeared to have become more attentive to our advice, and further smaller orders were executed as permitted by market conditions.

At this time, all investors experienced settlement delays and market difficulties in Portugal, which

**765**

was beyond both our and Pedersen's control. This was also the case for our agents in Portugal. There can be grounds to emphasize that even if the Portuguese settlement system had not broken down, and all shares were being delivered within a reasonable period of time, it would not have been possible to carry through such large transactions at acceptable prices after the stock market collapse in October 1987. Therefore, we advised our clients to keep their positions at that time.

Question 3: "Has a written agreement been signed between Ark Securities and L. Pedersen?"

Answer: There had been no written agreement signed by and between Ark Securities and L. Pedersen. But before Pedersen started trading through us, I talked... and... sent him a copy of our publication "Investment in Portugal — March 1987." Based on our conversations and this publication, Pedersen... could not have been in any doubt whatsoever about the Portuguese trading and settlement system, the risk of investing on this market and the services that could be provided by Ark Securities.

Question 4: "Was any information provided about the client that L. Pedersen — and Ark Securities — were acting on behalf of?"

Answer: Ark Securities were always solely acting on L. Pedersen's behalf. We had no knowledge whatsoever of Pedersen's clients

or that they were even acting on behalf of clients. Thus, it is out of the question that Ark Securities has acted on behalf of Pedersen's clients.

Question 5: "What was the procedure in connection with the acquisition of the shares?"

Answer: After we received a purchase order from a client, we gave orders to our bank in Portugal. After receiving a telex confirmation of the completed transaction from the bank, we sent a telex confirmation to the client along with a transfer certificate/sale note. We then ask the client to release the payment to us as of the value date. Once we receive a confirmation from the bank that the shares have been delivered to our account, we confirm the delivery to the client. In the meantime, we incorporate the shares into our monthly statement of holdings to the client from the transaction date, while specifying that delivery has not been made yet.

This was the procedure to the extent things were within our control. The execution of the order on the market, the payment to the market on the value date (by debiting our Portuguese account) and the final settlement, leading to the delivery of the shares, was conducted by our bank, which again acted through a broker... on the stock market... As explained under section 10, at this time, it was mandatory for a foreign broker to act through a Portuguese bank.

It is important to note that the Portuguese approach required the investor to make a payment before the part of the transaction that led to the final delivery of the shares could start. As a result of this, the issue of cash-for-delivery did not come under consideration for the investor.

Question 6: "What was the physical location of the shares after delivery?"

Answer: Based on information from Banco Espirito Santo e Comercial de Lisboa, the share certificates were kept in their safety vault at the headquarters in Lisbon, with credit to our account. ...

Question 8: "In whose name are the shares registered?"

Answer: The shares in question are bearer shares and are not recorded in the register of shareholders that is kept by the respective company. ... All Portuguese bearer shares are numbered, and while we are aware that specific numbered shares are held in our account, we do not keep records of these numbers or identify the holdings. In reality, ownership in our books functions as part of a pool of shares deposited in our securities account in Portugal. ...

Question 9: "Is any sub-account specified?"

Answer: This was not the case for L. Pedersen; there was no sub-account kept with Banco Espirito. All of our trades and all of our records in London were conducted and kept, respectively, solely in L. Pedersen's name.

Question 10: "Which correspondent bank was used for the purchases?"

Answer: Our correspondent bank was Banco Espirito Santo...

Foreign investors who wanted to trade in Portugal were supposed to open an account (including securities accounts) with a Portuguese bank. The bank was then supposed to ask the Bank of Portugal for permission to operate the account. We had opened such an account with Banco Espirito Santo in order to have a trading and securities account for our clients.

Question 11: "Was Mr. Pedersen aware of the use of a correspondent bank?

Answer: Yes ...

Moreover, Pedersen was aware that they had a number of options if they wanted to invest in Portugal.

a) They could open a trading account in Portugal (as under section 10) in their own name.

b) They could open an account with a sub-account in a client name (or ask Ark to do this).

c) They could use Ark's facility under a designation selected by them.

d) They could opt for a combination of the options granted in a), b) or c).

Pedersen notified us that they wanted to trade through our account in their own name.

Question 12: "Were any orders to correspondent banks placed in Ark Securities' [or] L. Pedersen's ... name?"

Answer: The orders to Banco Espirito were placed in our own name. All orders executed through our account with Banco Espirito were solely meant to be in our name. ...

Question 14: "What kind of documentation did Ark Securities receive in connection with the transactions and what documentation was received by L. Pedersen?

Answer: Ark Securities received confirmation of

**766**

the transactions from Portugal by telex, and we received diverse types of documentation regarding the delivery of shares to our securities account. Pedersen received confirmation by telex from us, transfer certificate/sale note, payment instructions, as well as a monthly statement listing the securities in the securities account."

Spanish Banco Santander answered certain questions that had also been put forward by the Plaintiff's attorney-at-law in a letter dated March 5, 1991. The letter reads, as follows:

"Question 1: "What kind of instructions did Banco Santander receive from L. Pedersen with regard to the purchases in question?"

Answer: ... all stock purchases were conducted in accordance with instructions given by L.P. over the telephone. ...

Question 3: "Has a written agreement been signed between Banco Santander and L. Pedersen?"

Answer: No written agreement had been signed by and between Banco Santander and L. Pedersen.

Question 4: "Was any information provided about the client that B.S. and L.P. were acting on behalf of?"

Answer: Banco Santander conducted all types of trades solely in L.P.'s name. We did not receive any further details about the identity of L.P.'s client. ...

Question 6: "What was the location of the shares after delivery?"

Answer: The physical assets were deposited into L.P.'s securities account with us at Banco Santander. ...

Question 8: "In whose name are the shares registered?"

Answer: All shares are deposited in L. Pedersen's registered name.

Question 9: "Is any sub-account specified?"

Answer: There is no sub-account.

Question 10: "Which correspondent bank was used for the purchases?"

Answer: The correspondent bank for the purchase was Banco Santander. The bank arranged for securities and settlement. Our merchant bank, "Banco Santander de Negocio", kept the return account in L. Pedersen's registered name.

Question 11: "Was L.P. aware of the use of a correspondent bank?"

Answer: Yes, it was us who were their correspondent bank.

Question 12: "Were any orders to correspondent banks placed in Banco Santander [or] L. Pedersen's name?"

Answer: We executed all orders in L. Pedersen's name.

...

Question 14: "What kind of documentation did Banco Santander receive in connection with the transactions, and what documentation was received by L.P.?"

Answer: As mentioned above, we received no documentation from L. Pedersen. On the other hand, we sent them the following documentation:

- Confirmation by telex for all types of transactions.
- Debit/credit advice for the transaction.
- Information about financial transactions..."

The Association of Danish Stockbroking Companies answered the following questions with regard to the case by letter dated June 9, 1993:

"Unless otherwise indicated, the answers of the Board of Directors refer to the conditions applicable to Danish stockbrokers and brokerage companies. Practices were the same, and as a main rule, we use the designation "stockbroker" in the following sections.

*Question 1.* Is it possible to point out at this time any practices in connection with the a) purchase, b) sale, c) safekeeping of foreign securities purchased by a Danish stockbroking firm (brokerage firm) abroad via foreign partners?

*Answer:* There were a number of practices in connection with the purchase, sale and safekeeping of foreign securities purchased by a Danish stockbroking firm (brokerage firm) abroad via foreign partners in the period 1987/88.

As a main rule, purchases of securities abroad were realized through a foreign partner, who purchased the securities on the market or in connection with an issue on behalf of the stockbroker. It was not uncommon for the purchase to go through several intermediaries.

As a main rule, foreign securities were not handed over to the client, but remained in custody with either the stockbroker or abroad. This practice had something to do with the regulation of foreign exchange relations, which went through a comprehensive overhaul in August 1988.

When securities were placed in a securities account abroad, it was, as a rule, the stockbroker's decision to place them in a securities account abroad. It was the stockbroker that usually selected the securities account, and the client had no influence over the choice.

It was common for a securities account to hold securities that belonged to several clients along with securities that belonged to the stockbroking firm. This notwithstanding, it was common for the depositary to be solely in the stockbroker's name.

It was not uncommon for securities not to be placed in a securities account with the stockbroker's direct partner abroad, but for the securities to be placed by this partner in a securities account with another securities dealer or financial institution.

Once the securities had been deposited in custody abroad, it was not uncommon for clients to receive some form of a depositary receipt or transcript issued by the foreign securities account.

It could often take exceedingly long from the date of transaction and until the securities were delivered. The length of time it took depended on the settlement regulations and practices in the country where the securities were purchased and on how many intermediaries there were in the chain.

It was common for the client to pay for the purchase immediately after the transaction was closed, irrespective of when the securities were delivered from the seller to the securities account designated by the stockbroker.

**767**

As a main rule, the client's documentation for the execution and payment of the transaction and the placement of the securities in custody was solely the stockbroker's own notice to the client.

Whether the client would be able to resell the foreign securities immediately after the trade day or would have to wait until the securities were delivered to the designated securities account depended on the respective stockbroker. As per usual practice, the client could trade in the securities regardless of whether the delivery had taken place.

*Question 2.* Can it be considered customary and/or consistent with good practice in the industry for shares purchased by a stockbroker firm on behalf of clients to remain in the depository financial institution in the name of the stockbroker firm?

*Answer:* It was customary and was considered consistent with good practice among brokerage firms and stockbroker firms to leave purchased stock with the depository financial institution in the name of the stockbroker firm.

In a letter to the Danish Savings Banks Association dated December 21, 1988, the Danish Financial Supervisory Authority delivered its opinion regarding the issue of the separation of securities accounts containing proprietary holdings from securities accounts containing client holdings in foreign depository banks. ...

A copy of this letter was first forwarded to the Association of Danish Stockbroking Companies on January 23, 1992. A copy of the letter was subsequently sent to all brokerage firms. The letter was not forwarded to the stockbrokers before they disappeared at the end of 1988, when the last provisions of the stock market reform from 1986 came into force.

Thus, the differentiation of client and proprietary securities accounts with foreign depository banks and the labeling of securities accounts with names other than the stockbroker's own name did not contravene good practice among stockbrokers and brokerage firms in 1987/88.

*Question 3.* Does it play any role in answering Question 2 if there was an additional intermediary involved, as was the case with the Portuguese shares, and if the respective stock was held as part of a pool that similarly included other stock that was purchased for other clients who had used the respective foreign company as an intermediary?

*Answer:* The fact that there had been an additional intermediary involved or that the securities were held as part of a pool has not played any role in answering Question 2. It appears that the Danish stockbroker was not aware that there had been an additional intermediary.

*Question 4.* Should it be considered customary and/or consistent with good practice in the industry to refrain from setting up a sub-account or provide any other identification, whereby the depository bank and/or the intermediary involved registers the existing client to whom the shares belong?

*Answer:* In the period in question, it was common to refrain from setting up a sub-account or provide any other identification, to the effect that the depository bank and/or the intermediary did not register that this was a client relationship, let alone the client's identity.

See also the answer to Question 2."

The aforementioned letter from the Danish Financial Supervisory Authority to the Danish Savings Bank Associated dated December 21, 1988 stipulates, among other things:

"The Association argues ... that in view of the problems that may come to being with regard to the solvency of the savings banks, you should arrange for the setup of two securities accounts with the foreign depository bank, one for the savings bank's own securities and another one for the client's securities, so that if the savings bank is declared bankrupt, there can be no doubt at the depository bank which securities belong to third parties, even if it would possible to establish this solely based on the savings bank's bookkeeping.

In this connection, the Financial Supervisory Authority has to deliver the following opinion:

... the Financial Supervisory Authority considers it a requirement for the depository bank to clearly differentiate between securities that belong to the savings bank and securities that belong to clients of the savings bank. It is noted that the Financial Supervisory Authority hereby has not addressed the issue whether the protection of the depositor against loss in case of bankruptcy of the savings bank should require any additional measures."

The parties agree that at the time of bankruptcy, Fondsbørsvekselerer L. Pedersen I/S did not have any proprietary holdings of EFACEC and Amper shares.

The Plaintiff's claim amounting to DKK 632,425.50 is the sum total of the set-off amounts of DKK 601,550.88 and DKK 30,874.62.

The Defendant's claims are set out, as follows:

1) Principal claim: The amount of DKK 21,683.85 is the difference between the incorrect amount of DKK 30,874.62 and the amount of 9,190.77, whose sum has been agreed.

2) Alternative claim: The parties agree that the shares as of the bankruptcy date on June 21, 1988 had an overall market value of DKK 301,848.48. The amount of DKK 330,577.02 constitutes the difference between this

market value and the total value of DKK 632,425.50 that has been set off by the Defendant.

3) The claims in the further alternative and the yet further alternative read, as follows: The amount of DKK 458,393.79 is the difference between the consideration for the sale of 700 EFACEC shares, which amounts to DKK 174,031.71 and the total amount of DKK 632,425.50 that has been set off by the Defendant.

Testimonies have been given by the Chief Accounting Officer, Per Bach Sørensen, Internal Controller Jørgen Eker, Director Mogens Pihl as well as stock trader Claus Jensen.

Per Bach Sørensen has testified, among other things, that he had been an employee of Fondsbørsvekselerer L. Pedersen I/S since April 1, 1986. He took care of day-to-day records and the reporting and accounting functions. He was in contact with, among other things, the Defendant. He did not take part in the trading in shares, but followed up on any transactions in terms of

**768**

documentation. He only heard after the bankruptcy that there had been problems with the settlement of the EFACEC and Amper stock.

There was work under way to ensure that the client base would be differentiated in sub-accounts abroad. Strictly speaking, the witness was not of the opinion that this was necessary; Fondsbørsvekselerer L. Pedersen I/S could earmark the papers themselves. Nevertheless, individualizing "just to be on the safe side" was the "hot topic of the day." The Danish central securities depository's manner of registration made it natural to introduce a corresponding manner of registration abroad. Financial institutions also had a practice of sub-account listing. The witness had heard lectures on this.

Jørgen Eker has testified, among other things, that he was hired by Fondsbørsvekselerer L. Pedersen I/S in August 1982. The witness was a "trader" and dealt mostly with stocks, including foreign stock.

A typical trade in foreign shares starts with an order placed by a client. In this case, Fondsbørsvekselerer L. Pedersen I/S turns to its local partner, which is a bank or a broker. However, the Portuguese EFACEC shares were traded through a UK broker, Ark. The EFACEC shares were settled "unbelievably slowly." He kept an order book relating to foreign shares. The entry as of November 11, 1987 means that Claus Jensen has asked the 1,200 EFACEC shares to be sold in the best way possible. The witness was of the opinion that if the purchase had not been finalized, it was not possible to sell them. It was common business procedure to call Ark and confirm the order by telex. There were problems with Ark in connection with the transaction. The witness continuously briefed the Defendant of the difficulties. The Defendant was certainly not satisfied but took note of the briefing. A limit was agreed on January 27, 1988, because Ark wanted to apply a minimum price that the sale could take place at without asking Fondsbørsvekselerer L. Pedersen I/S. At one point, they sold 700 EFACEC shares. The witness was quite possibly involved in the sale but does not recall any details. When shares were purchased abroad, the shares were noted down, as appropriate, in the client's name. Some clients wanted to be noted down in a sub-account for the sake of greater security, whereas others did not. The Defendant had not made such a demand. At that point, you only did whatever you asked to do. If sub-account listing was requested, they could notify their foreign partner to arrange for such listing. L. Pedersen I/S' bookkeeping always made it clear who it was that owned the shares.

The witness is familiar with a memo prepared by the Defendant's attorney-at-law on January 8, 1988. The memo takes the form of a letter addressed to the witness. The memo further makes it clear that sub-account listing helps achieve greater security. However, the memo did not give rise to a general change in practice. A "best possible" sale is normally conducted quickly, but, depending on the circumstances, it may take longer. The witness recalls that there had been a stock market crash in 1987. The Defendant's orders to sell the stock may well have had something to do with the crash. It was usually possible to expect a quick sale.

Copyright © 2021 Karnov Group Denmark A/S

However, the respective market was new and was not particularly large. This was something the Defendant was aware of, as well. The witness does not remember whose idea it was to introduce the Portuguese securities.

Mogens Pihl has testified, among other things, that he assumed the post of Director of the Defendant on November 1, 1987. The Defendant wanted to sell the stock after the stock market crash. The Defendant notified Fondsbørsvekselerer L. Pedersen I/S that they wanted to sell, but a reply came after two days that the stock was not available. The settlement period is certainly somewhat longer in Southern Europe, i.e., 14 days, but the witness has never experienced an impossibility to sell the shares. Prior to his appointment at the Defendant, the witness had been employed at a stockbroker firm. The Defendant's Board of Directors decided to adopt a "firm stance." He contacted Fondsbørsvekselerer L. Pedersen I/S. In the end, when they could not get the papers, the Defendant ended up not standing by the trade. The witness spoke on the telephone with the Director of Fondsbørsvekselerer L. Pedersen I/S, Steffen Rasmussen, who was also dissatisfied that they could not deliver the shares. On December 18, 1987, a letter about the transaction was sent to Fondsbørsvekselerer L. Pedersen I/S, and this was the last day when the Defendant had been prepared for sale with a value date on December 3, which was the date when the rate was known. It was certainly stated already in January that the trade would not be accepted. It is true that 700 EFACEC shares were sold since, and that the Defendant gave the instruction to sell the remaining 500 shares on May 9, 1988. However, at that point the Defendant had long since told Fondsbørsvekselerer L. Pedersen I/S that "they did not want to have anything to do with these shares." It is also true that there had been efforts to sell them in January-February 1988. As regards this activity, the witness can only say that the Defendant would only play along when Fondsbørsvekselerer L. Pedersen I/S believed that the Defendant was obliged to stand by the trade. Therefore, the efforts to sell must be regarded against the background of the Defendant's desire to limit the loss, but the position of the witness may be an expression of rationalization after the fact. The witness believes that the purchased shares were placed in the Defendant's securities account abroad, but there were no written agreements with Fondsbørsvekselerer L. Pedersen I/S with regard to the procedure. At all events, the witness expected the foreign bank to have registered that the owner was the Defendant. There had been a thorough discussion after the emergence of the case as to how they should manage foreign stock. The witness has probably seen the preliminary settlement of May 3, 1988 but does not recall it. The Defendant made his set-off statement on August 5, 1988. It was first at that time that they settled their pecuniary claim. Nevertheless, the trade had already been canceled before that. It is certainly true that they had previously just made a written "reservation" to cancel. However, the witness had occasionally told Steffen Rasmussen that the Defendant would cancel. The rate of 13%, which is the basis for

**769**

the interest charge, is selected as an expression for the fact this is the default interest. The claim of DKK 601,550.88 was only charged to the collateral account because the balance in this account had been positive. The account is the Defendant's security for the commitment; the Plaintiff could therefore not dispose of it. The Defendant did not lose the collateral of DKK 5 million that came from selling the collateral deposits by depositing this amount of money into the collateral account.

*Claus Jensen* has testified, among other things, that he was hired by the Defendant in August 1986 and that he quit in December 1990. In the beginning, the witness was an equity analyst. In the autumn of 1987, he was assigned the responsibility for the Defendant's proprietary holdings of Danish and foreign stock. The witness purchased EFACEC shares for the proprietary holding and recommended to some of the Defendant's clients to make similar purchases. The client base was limited. The Portuguese market is speculative. It was originally Fondsbørsvekselerer L. Pedersen I/S that had recommended that Portuguese market. The Defendant wanted to divest the shares when the

stock market in the USA crashed. The witness called Fondsbørsvekselerer L. Pedersen I/S and said that they wanted to sell. There was no limit for the sale. "Best possible" orders are normally invoiced on the same or on the following day. It is true that "sensitive securities" are traded in the course of a week. The witness was told — no doubt later than November 1987 — that a sale was not possible because the shares were not available. This was not something the witness had ever experienced, either before or after. A limit was subsequently introduced. The witness is not familiar with the background, but this happened on Fondsbørsvekselerer L. Pedersen I/S's recommendation. Pihl asked Fondsbørsvekselerer L. Pedersen I/S to repossess the shares, but the witness does not remember when this happened. In April/May 1988, the Defendant did not know "who had justice on their side." The efforts to sell the stock must be viewed in this light; the witness does not recall exactly the course of events, but it would have at any rate been normal to react as happened. The witness does not recall if he saw the preliminary settlement of May 3, 1988. He did not know where in the world the shares were physically located. It is customary to establish a securities account in the foreign bank or with the foreign broker. The witness did not initially know that Fondsbørsvekselerer L. Pedersen I/S had used a UK broker in order to purchase the Portuguese shares. The witness did not make a demand for sub-account listing in connection with the purchases, and the question was certainly not touched upon at a later date.

In support of its claims, the Plaintiff has claimed that the set-off is unjustified principally because the Defendant has not been entitled to terminate the concluded transaction and, in the alternative, because set-off is precluded pursuant to Section 42, Paragraph 1 of the Danish Bankruptcy Act, since the Defendant did not have a claim at the time of issue of the bankruptcy notice that could justify set-off, and because set-off with regard to the established collateral account is precluded.

The Plaintiff has additionally stated that Fondsbørsvekselerer L. Pedersen I/S has performed the agreement relating to the Defendant's purchase of the shares. Cancellation with regard to the Plaintiff did not happen until after the bankruptcy. Then it is unjustified. The Defendant did not claim sub-account listing, and it can therefore be assumed that the Defendant agreed that the shares would remain abroad. The transaction was made by and between professionals, and there is a generic purchase procedure with regard to negotiable shares. The Defendant had actually had at its disposal more than 700 of the EFACEC shares, and the opinion of the Association of Danish Stockbroking Companies also makes it clear that it was normal procedure for the client to be able to trade whether or not delivery had taken place. An employee of the Defendant, the witness Jensen, has testified that the Defendant wanted to divest the shares when the stock market crashed.

However, if the delivery is deemed to have happened too late, the Defendant has forfeited its right of cancellation. It follows from Section 27 of the Danish Sale of Goods Act that if a party wants to terminate a purchase, this party shall make a specified complaint without undue delay or, i.e., that the attention of Fondsbørsvekselerer L. Pedersen I/S should have been called to such termination. However, this has not taken place. It is alleged that a notice of cancellation has been given verbally. Sales instructions have been given at later times in the course of events, and it is most recently the Defendant's request of August 17, 1988 for the transfer of shares to the Defendant's Spanish banker that indicates that they still considered themselves eligible to the shares.

The rules regarding agency are irrelevant. When the shares were acquired, the agency relationship was terminated and replaced by an administrative relationship. It was on account of the provisions on foreign exchange that the shares remained where they were abroad. The all-monies clause referred to Fondsbørsvekselerer L. Pedersen I/S' operating loan and cannot be applied to any outstanding accounts with regard to shares.

The Defendant is not entitled to damages, since the opinion of the Association of Danish Stockbroking Companies indicates that Fondsbørsvekselerer L. Pedersen I/S has acted in all respects in accordance with the norms. The witness Jensen has testified that the Portuguese market is speculative and that there had been no requirements placed for sub-account listing.

Copyright © 2021 Karnov Group Denmark A/S

The Defendant had a contractual right to the shares, but as a result of the bankruptcy, it is the rules on the transfer of ownership right that should apply. Therefore, what is of decisive importance is that the necessary individualization has happened, thus making it possible to identify the securities that belong to the Defendant. The Defendant's Portuguese shares were placed in a pool and accounted for a part of it. It would have been quite simple to record them into a sub-account. The statement given by Ark Securities indicates that it would have been possible to open an account with a sub-account in a client's name or ask Ark to do this. It is true enough that the records of the stockbroking firm and the Defendant tallied at the time of the bankruptcy. However, this fact is not synonymous with individualization since it was not possible to differentiate the Defendant's securities. The relevant collateral document would have been proof to the depository financial institution that these were client securities accounts. Fondsbørsvekselerer L. Pedersen I/S' records should also have

**770**

specified which share numbers had been purchased. Consequently, the Defendant is not entitled to the status of secured creditor to the Plaintiff's bankruptcy estate. It is certainly true that the Plaintiff in a certain sense obtains enrichment from retaining both the purchase price and the shares, but such enrichment is not unfounded, since this follows from the creditors' access to legal proceedings.

The Defendant's counterclaim was a claim to have the securities surrendered to it. The principal claim was a pecuniary claim. Therefore, set-off is precluded on account of the nature of the claim, cf. Section 42, Paragraph 1 of the Danish Bankruptcy Act. The same also applies to the claim for the sales price of the shares that were sold, since this claim was first converted into money after the bankruptcy notice.

The collateral account yielded such interest as was customary between professionals in the financial world. The Plaintiff has proven that they, according to a tacit agreement with Fondsbørsvekselerer L. Pedersen I/S or according to custom, are entitled to interest even prior to litigation.

In support of its claims, the Defendant has in turn claimed that the transaction could have been canceled because of failed or delayed delivery. Moreover, the Defendant is entitled to compensation for negative contractual interest. In the alternative, the claim for compensation is based on a general consideration of guilt. In the further alternative, the Defendant has claimed that it is not a matter of set-off, but of satisfaction obtained from pledged assets.

The Defendant has further pointed out that the shares have never been delivered. The buyer of any stock is entitled to the observance of such formal requirements as to give the buyer formal legitimacy. If it is a matter of bearer shares as in this case, the buyer is entitled to get the shares in its possession. However, this has not happened. According to the provided information, it is possible that Fondsbørsvekselerer L. Pedersen I/S has done what is customary, yet no stand has been taken on what is customarily the assignor's duty for safeguarding the assignee's creditor protection.

The question if delivery has taken place must be assessed based on the common provisions of the law on sale of goods and not based on practices that have been set out unilaterally by the stockbroking industry. The Defendant has no influence over the choice of place and manner of deposit. It is irrelevant that the Defendant itself had not asked for sub-account listing; the Defendant was certainly unaware of how to deal with the shares. If proper delivery had taken place, a securities account would have been established, thus making the creditor protection indisputable. Cancellation took place as early as witness Pihl's oral testimony that the Defendant did not want to hold the shares or, at all events, in connection with the set-off statements.

If delivery had nevertheless taken place, it would have taken place too late, as any delay in the concluded business transaction is material, cf. Section 21, Paragraph 3 of the Danish Sale of Goods Act. Moreover, circumstances other than the failure to

deliver the shares on time could constitute breach, to the effect that the principle in § 21 of the Danish Sale of Goods Act can find application. Thus, the fact that the Plaintiff has not wished to surrender the shares or settle the proceeds of the shares sold constitutes a breach that justifies termination of contract.

The dispute between the parties is a matter of commercial agency, cf. Section 4 of the Danish Commercial Agents Act. As a general rule, the Defendant was naturally under a duty to complain in connection with the delay, cf. Section 23 of the Act, but the Defendant's obligation is not as far-reaching as to apply under the circumstances, cf. Section 24, considering that Fondsbørsvekselerer L. Pedersen I/S has acted in gross negligence, cf. below, which has led to material damage to the Defendant.

The Plaintiff is labile for damages, because Fondsbørsvekselerer L. Pedersen I/S has acted wrongfully, including has demonstrated the kind of negligence that must be classified as gross. The stockbroker firm should have secured the Defendant's ownership right and set up an independent securities account or arranged for sub-account listing. This has been quite evident. The witness Sørensen has attended lectures on such listing, and the witness Eker was familiar with the memo dated January 8, 1988. It is evident from the information provided by Ark Securities that Fondsbørsvekselerer L. Pedersen I/S could open an account with a sub-account in a client's name (or ask Ark to do this), but Fondsbørsvekselerer L. Pedersen I/S had stated that they wanted to trade via Ark's account in their own name.

Fondsbørsvekselerer L. Pedersen I/S neglected its obligation to keep the shares separate from other assets, cf. Section 10, Paragraph 1 of the Danish Commercial Agents Act. They were aware that the Spanish and Portuguese market were risky but failed to notify the Defendant of this. The statement given by the Association of Danish Stockbroking Companies makes it clear that the usual practice was for the client to be able to trade in the securities regardless of whether the delivery had taken place. This was also the Defendant's opinion, but Fondsbørsvekselerer L. Pedersen I/S failed to take the necessary measures.

The Defendant's losses must correspondingly be estimated at the purchase price plus interest because the Defendant must be treated as if the transaction had not been concluded. The rate as at the date of bankruptcy is irrelevant because the Defendant is not supposed to bear the market price risk.

The Defendant has obtained satisfaction for its claim in connection with the breach by setting off against the collateral account that is not affected by the bankruptcy, cf. Section 91, Paragraph 1 of the Danish Bankruptcy Act. It is true that the security interest primarily referred to Fondsbørsvekselerer L. Pedersen I/S' operating loan, but the loan agreement has contained an all-monies clause. Moreover, set-off against existing pecuniary claims complies with Section 42, Paragraph 1 of the Danish Bankruptcy Act, because the Defendant's claim came to being at the time of the conclusion of the agreement and is thus acquired prior to the bankruptcy date.

The Defendant's alternative claim takes the form of consideration for damages. The loss must be estimated taking into consideration Fondsbørsvekselerer L. Pedersen I/S' knowledge of market risks and the fact that the Defendant has been precluded from disposing of the securities and limiting its loss. The Plaintiff may only keep the shares and

**771**

the proceeds from the sale, to the effect that the Defendant bears the market price loss, if the stock trade were completed. If this is not the case, the Plaintiff obtains unjust enrichment.

In the further alternative, the claim takes the form of recognition of the Defendant's position as secured creditor in relation to the unsold shares. It must be assumed that various accounts in Spain and Portugal as well as with Ark Securities, Fondsbørsvekselerer L. Pedersen I/S and the Defendant have tallied. The parties were aware that these were client securities accounts. At the time of bankruptcy, there was no stock that belonged to Fondsbørsvekselerer L. Pedersen I/S themselves. The fact that the foreign securities accounts were set up in Fondsbørsvekselerer L. Pedersen I/S' name was a practical and a purely formal measure.

In the yet further alternative, the claim means that the Defendant obtains satisfaction, as per security interest law, for the claim to the sales price for the shares that it has managed to divest. Insofar as the two latter claims are concerned, a consideration for damages becomes relevant, as well, cf. above.

The allegation that the Plaintiff has a justification for charging interest prior to litigation is hereby disputed.

### Observations of the Court:

It is assumed that the Defendant's orders to sell the shares had been observed until set-off was undertaken. The Defendant is not found to have proven that it has given notice of termination during its verbal discussions with Fondsbørsvekselerer L. Pedersen I/S. Under these circumstances, the Defendant is found to have considered the purchased shares to be delivered. Therefore, the Defendant is not entitled to have the purchase price reimbursed.

Against the background of the statement given by the Association of Danish Stockbroking Companies, the Defendant is not found to have proven that Fondsbørsvekselerer L. Pedersen I/S was contractually obligated to create a sub-account or similar in order to record who it was that the stock belonged to. Since it is not established, either, that the stockbroker firm has otherwise breached the contract, the Defendant is not entitled to damages.

The Defendant's stock was kept together with stock that was owned by third parties, without any details as to who these shares belonged. Under the present circumstances, the Defendant's ownership right — irrespective of any correspondence between the stockbroker firm and the Defendant's records — is found not to have been upheld with regard to the estate in bankruptcy that is the Plaintiff, because there has not been adequate individualization of what was decisive for the performance of the stock trades.

The claim for the purchase price for the sold shares must be regarded as secured in accordance with the agreement dated June 13, 1988. The Defendant is found to have been entitled to obtain satisfaction for the claim, cf. Section 91, Paragraph 1 of the Danish Bankruptcy Act.

Since the Plaintiff is not found to have established the claim for default interest prior to litigation, judgment is delivered in accordance with the Defendant's claim in the yet further alternative.

- - -

The Defendant, EPA Bank A/S, formerly Idé-Banken A/S, shall pay to the Plaintiff, Fondsbørsvekselerer L. Pedersen I/S in bankruptcy, represented by the trustees, attorneys-at-law Pernille Bigaard, Peter Bøgelund and Steen Klein, the legal costs amounting to DKK 35,000.

## Supreme Court of Denmark

### Judgment of the Supreme Court

The judgment under appeal has been delivered by the High Court of Eastern Denmark.

Seven judges have taken part in the adjudication: Kiil, Hornslet, Marie-Louise Andreasen, Poul Sørensen, Blok, Jørgen Nørgaard and Børge Dahl.

The Appellant, the Danish Bankers Association (Finance Denmark), acting on behalf of Administrationsselskabet af April 2, 1990 A/S, has contended before the High Court that the Respondent, Fondsbørsvekselerer L. Pedersen I/S in bankruptcy, must hand over to Administrationsselskabet the 500 EFACED shares and 133 Amper shares in question, along with the proceeds obtained during the bankruptcy proceedings, in exchange for the payment of the DKK 458,393.79, with statutory interest from the commencement of proceedings, which the estate in bankruptcy has been awarded by the judgment of the High Court.

The estate in bankruptcy has claimed that the judgment should be upheld.

Thus, as regards the Supreme Court, the proceedings only concern the issue if Administrationsselskabet as a secured creditor is entitled to have the shares surrendered to it.

In the course of the proceedings before the Supreme Court, the parties have agreed to only disclose the facts relating to the EFACEC shares and

to determine whether a similar fact can be taken into account in connection with the judgment for the Amper shares.

There are sale notes issued by the stockbroker firm to Idé-Banken "relating to our sale to you" of 300, 700, and 200 EFACEC shares, respectively. The sale notes contain details about, among other things, value date, name of security, quantity, market value, and the amount in DKK that was payable by the bank. The parties agree that these notes were sent to the bank at the very latest when the stockbroker firm placed an order with Ark Securities for the purchase of the stock. On the value date — or on the previous day — the bank sent the stockbroker firm a confirmation note — "purchased by you" — that contained matching information about the value date, name of security, quantity, market value, and the amount in DKK that was payable by the bank. The parties agree that the consideration was forwarded to Ark immediately after its receipt by the stockbroker firm and that it was thus Ark that has kept the amounts in a securities account as security for the purchase orders given by Ark to the Portuguese bank. Moreover, there are sale notes issued by the stockbroker firm to the bank "relating to our purchase from you as an agent" of 700 EFACEC shares.

Furthermore, there are notes referring to the EFACEC shares issued from Ark to the stockbroker firm referring to "You have today bought from ourselves as principals..." and "We have today sold on your behalf..." as well as depository notices from Ark to the stockbroker firm relating to the stockbroker firm's "safe custody account" with Ark, which

**772**

confirm that "we hold the following securities on your behalf." The purchase and sale notes as well as the depository notices match each other.

Finally, there is a securities account statement from the stockbroker firm to Idé-Banken as well as a comprehensive list of holdings for the stockbroker firm. These are in close agreement with what has been presented above. The parties agree that all transactions performed by the stockbroker firm's foreign department have been conducted electronically, with a separate entry for each security name, under which a "negative holding" has been entered for the holding in the respective depository institution, here Ark, and a "positive holding" for the client's depository holdings with the stockbroker. The parties further agree that the stockbroker firm's securities account and accounting records "for foreign stock" have been kept "neatly and securely." The parties further agree that the stockbroker firm has not held proprietary holdings of EFACEC stock in the period from the summer of 1987 and until the date of bankruptcy. Finally, the parties agree that as at the date of bankruptcy, there were a total of 1,000 EFACEC shares in the stockbroker firm's securities account with Ark, whereof 500 were recorded in the stockbroker firm's list of holdings as property of Idé-Banken and 500 as property of Bendix Bank, which did not have sub-account listing for foreign stock, either.

The parties have stated that Amagerbanken, which has taken over Bendix Bank in the meantime, "has been handed over its 500 shares, for which they have been granted the status of secured creditor in accordance with a delivered judgment, which is final."

The Appellant has stated that there is a deposit agreement in the form of a regular deposit ("depositum regulare") and that the stockbroker firm was not entitled to dispose of the deposited shares with regard to Idé-Banken. In this respect, it is irrelevant that the stockbroker firm has acted as title holder of the stock with regard to Ark. Since it is possible to securely identify the stock in the bankruptcy estate, considering that the stockbroker firm's records of the securities account already indicate how many shares each individual client has in the securities account, Administrationsselskabet as owner is consequently entitled to have the stock surrendered.

The estate in bankruptcy has maintained that Idé-Banken has not become owner of the shares since there has been no proper individualization of the shares that were placed in a collective securities account with a third party. Moreover, the stockbroker's purchase of foreign stock and its subsequent placement in a securities account has not had the nature of a regular deposit.

**Observations of the Supreme Court.**

Pursuant to the agreements between Idé-Banken and the stockbroker firm L. Pedersen I/S, the stockbroker firm was supposed to purchase the EFACEC stock for the bank as agent. The purchases were made through the UK brokerage firm Ark Securities, the Portuguese bank Banco Espirito and the bank's agent on the Portuguese stock market, and the stock was deposited into Ark's securities account with Banco Espirito. At the time of purchase, the stock had become B's property, cf. Section 53, Paragraph 2 of the Danish Commercial Agents Act.

At all events, in a case such as this one, where the stockbroker firm's collective securities account with Ark did not contain EFACEC stock that belonged to the stockbroker firm itself, the fact that Idé-Banken's stock was held in a securities account together with EFACEC shares that belonged to other clients of the stockbroker firm, without an indication of who this stock belonged to, was not decisive for Administrationsselskabet's right to claim its ownership right against the bankruptcy estate. The necessary proof that is to serve as a basis for the withdrawal of the number of EFACEC shares that belong to Administrationsselskabet can take place in accordance with the stockbroker firm's reliable accounting, cf., in this connection, Section 6, Paragraphs 3 and 4 of the Danish Act no. 1072 of December 20, 1995 on Trading in Securities.

Thus, the Supreme Court upholds the Appellant's claim.

## On these grounds, the court rules that:

*The Respondent, Fondsbørsvekselerer L. Pedersen I/S in bankruptcy, represented by the trustees, attorneys-at-law Pernille Bigaard, Peter Bøgelund and Steen Klein, shall hand over to Administrationsselskabet af April 2, 1990 A/S 500 EFACEC Emp Fabrie de Maquinas Elec shares and 133 AC. Amper Abr 87 shares and pay the proceeds of these shares obtained in the course of the bankruptcy proceedings, in exchange for the payment from Administrationsselskabet to the Respondent of the amount of DKK 458,393.79, with statutory interest from September 21, 1990.*

*As regards the partial legal costs before the High Court and the Supreme Court, the Respondent shall pay to the Danish Bankers Association, acting on behalf of Administrationsselskabet af .April 2, 1990 A/S, the amount of DKK 40,000.*

*The judgment shall be implemented within 14 days of being delivered.*

**U.1997.762H**

**H.D. 20. marts 1997 i sag II 42/1994**

*Finansrådet som mandatar for Administrationsselskabet af 2. april 1990 A/S (tidligere Idé-Banken A/S og EPA Bank A/S) (adv. Jon Stokholm, Kbh.)*
mod
*Fondsbørsveksselerer L. Pedersen I/S under konkurs ved kuratorerne, advokaterne Pernille Bigaard, Peter Bøgelund og Steen Klein (adv. Steen Klein, Kbh.).*

*Aftaler 5.2 Ejendomsret 2.1 Pengevæsen m.v. 2*

**Køber af udenlandske aktier, der var indlagt i vekselererfirmas samledepot, separatist i firmaets konkursbo.**

♦ Vekselererfirmaet V indkøbte i 1987 for banken B nogle portugisiske EFACEC aktier. V foretog købet gennem et engelsk børsmæglerselskab A, og aktierne blev indlagt i dettes samledepot i en portugisisk bank. Hos A var V registreret som ejer af aktierne, og V's depot hos A indeholdt tillige EFACEC aktier tilhørende andre kunder hos V. I juni 1988 blev V erklæret konkurs, og der opstod tvist om, hvorvidt B som separatist havde krav på udlevering af aktierne. Disse var ved købet blevet B's ejendom, jf. kommissionslovens § 53, stk. 2. I hvert fald i et tilfælde som det foreliggende, hvor V's samledepot hos A ikke indeholdt EFACEC aktier tilhørende V selv, var det ikke afgørende for B's adgang til at hæve sin ejendomsret over for konkursboet, at B's aktier var indlagt i depotet sammen med EFACEC aktier tilhørende andre kunder uden angivelse af tilhørsforholdet. Udtagelse af B's aktier kunne ske i overensstemmelse med den foretagne - pålidelige - bogføring hos V, jf. herved § 6, stk. 3 og 4, i lov om værdipapirhandel m.v.[1] Sagen blev afgjort på samme måde for så vidt angik nogle spanske aktier, som var indlagt i V's samledepot i en spansk bank. For landsretten havde B principalt gjort gældende, at B antaget havde været berettiget til at hæve købene og foretage modregning med tilbagebetalingskravet, men dette blev ikke gentaget for Højesteret.

**Østre Landsret**

**Østre Landsrets dom 16. december 1993 (7. afd.)**

(Vagn Rasmussen, K. Wiingaard og Ina Steincke).

 Denne sag drejer sig om aktiekøberens stilling i vekselererens konkursbo, hvor køberens aktier beror sammen med andre hos tredjemand.

 Under sagen, der er anlagt den 21. september 1990, har sagsøgeren, Fondsbørsveksselerer L. Pedersen I/S under konkurs ved kuratorerne, advokaterne Pernille Bigaard, Peter Bøgelund og Steen Klein, efter sin endelige påstand påstået sagsøgte, EPA Bank A/S, tidligere Idé-Banken A/S, dømt til at betale 632.425,50 kr., subsidiært et af retten fastsat mindre beløb, med tillæg af sagsøgtes til enhver tid gældende højeste indlånsrente af 601.550,88 kr. fra den 5. august 1988 og af 30.874,62 kr. fra den 17. oktober 1988, alt til sagens anlæg og fra dette tidspunkt med tillæg af procesrente af beløbet.

 Sagsøgeren har mere subsidiært påstået sagsøgte dømt som angivet i de nævnte overordnede påstande, men dog mod udlevering af de i boet i sagsøgtes navn registrerede værdipapirer med tillæg af de under bobehandlingen oppebårne udbytter.

 Sagsøgte har påstået frifindelse mod betaling af principalt 21.683.85 kr., subsidiært et efter rettens skøn fastsat beløb ikke over 330.577,02 kr., mere subsidiært - mod udlevering af 500 stk. EFACEC aktier og 133 stk. Amper aktier og afregning af de under konkursbehandlingen oppebårne udbytter - ikke over 458.393,79 kr. og mest subsidiært alene mod betaling af ikke over 458.393,79 kr., alt med sædvanlig procesrente fra sagens anlæg.

 Baggrunden for sagen er i korte træk, at sagsøgte gennem det senere konkursramte vekselererfirma, nu sagsøgeren, erhvervede et antal portugisiske og spanske aktier og betalte købesummen. Papirerne henlå i udlandet sammen med aktier, der tilhørte andre. Sagsøgtes aktier blev - til dels forgæves - søgt realiseret. Efter konkursen modregnede sagsøgte købesummen og renter af denne.

 Der foreligger nærmere følgende:

 Fondsbørsveksselerer L. Pedersen I/S bistod sagsøgte med erhvervelse og salg af udenlandske aktier og værdipapirer; desuden ydede sagsøgte lån til vekselererfirmaets drift.

 I henholdsvis juli og september-oktober 1987 købte sagsøgte med bistand af Fondsbørsveksselerer L. Pedersen

**763**

I/S 133 stk. spanske aktier med navnet AC. Amper Abr 87 og i alt 1.200 stk. portugisiske aktier med navnet EFACEC - Emp Fabril de Maquinas Elec. Der blev udvekslet aktienotaer med bekræftelse henholdsvis af, at papirerne var solgt til sagsøgte og afkøbt Fondsbørsveksselerer L. Pedersen I/S.

 Der blev senere gjort forsøg på at afhænde aktierne.

 Til belysning af begivenhedsforløbet er der fremlagt kopi af en ordrebog, som blev løbende ført hos Fondsbørsveksselerer L. Pedersen I/S. Bogen er håndskrevet og indeholder kortfattede notater, derunder symboler, hovedsagelig i kronologisk orden. Af bogens indhold kan der på grundlag af oplysninger under foreleggelsen i forbindelse med domsforhandlingen af sagen udledes følgende:

 Den 11. november 1987 kl. 10.30 telefonerede sagsøgtes medarbejder Claus Jensen til Fondsbørsveksselerer L. Pedersen I/S og anmodede om, at blandt andre samtlige 1.200 stk. EFACEC aktier måtte blive solgt. Senere samme dag gjorde medarbejderen hos Fondsbørsveksselerer L. Pedersen I/S følgende notat i bogen: »Endnu ikke klar til salg!« Ligeledes samme dag kl. 15.55 var medarbejderen på ny i telefonisk kontakt med Claus Jensen, der annullerede ordren. Det blev aftalt, at Fondsbørsveksselerer L. Pedersen I/S skulle give besked, når levering var mulig.

 Den 2. december 1987 kl. 10.25 anmodede en anden af sagsøgtes medarbejdere, Bjarne Bering, om, at EFACEC aktierne måtte blive solgt »bedst muligt«. Fondsbørsveksselerer L. Pedersen I/S korresponderede med en engelsk mægler, Ark Securities, for så vidt angår handel med portugisiske aktier. Samme dag kl. 11.40 havde medarbejderen hos Fondsbørsveksselerer L. Pedersen I/S en telefonsamtale med en navngiven medarbejder hos Ark Securities. EFACEC aktierne blev ikke solgt ved denne lejlighed.

 Den 18. december 1987 sendte sagsøgte følgende skrivelse til Fondsbørsveksselerer L. Pedersen I/S:

 »Idet vi referere til diverse telefonsamtaler omkring salg af følgende aktier:

 ...

---

**1** RT 1916-17, A sp. 2972 f, 3040 ff, FT 1995-96, L 71 s. 42 f, U 1927.21 H, U 1928.11 H, U 1929.702 H, U 1959.688 V, U 1985.849 SH, U 1985.856 SH, U 1994.719 Ø, Lassen: obligationsrettens specielle Del (4. udg. 1931) s. 325 ff, Illum: Tingsret (3. udg. 1976) s. 184 f, Carstensen: Ting og sager (1982) s. 76 ff, Munch: Konkursloven (7. udg. 1993) s. 281 f samt Ruben Andersen i Justitia 1995, nr. 3 s. 1 ff.

Copyright © 2021 Karnov Group Denmark A/S

... 1.300 stk. EFACEC
...

133 - Amper

skal vi herved bekræfte vort ønske om snarest muligt salg.

Såfremt ovennævnte aktier, stærkt imod vores forventninger, ikke er solgt inden den 31. d.m., forbeholder vi os ret til at sælge aktierne til Dem til de på den 3/12 1987 noterede kurser.«

Der er enighed om, at det angivne antal EFACEC aktier rettelig skal være 1.200.

Af ordrebogen fremgår videre, at medarbejderen hos Fondsbørsvekselerer L. Pedersen I/S den 26. januar 1988 kl. 9.05 i anledning af ordren af 2. december 1987 spurgte sagsøgtes medarbejder Bjarne Bering, om sagsøgte ønskede »limitering«. Forespørgslen blev besvaret benægtende.

Den 27. januar 1988 kl. 9.30 havde Fondsbørsvekselerer L. Pedersen I/S på ny en samtale med den pågældende medarbejder hos Ark Securities. I bogen er anført følgende:

»Han hævder, at han ikke har modtaget ordrene af 2.12.87. Det er direkte løgn, men ikke noget problem, fordi aktierne ikke har været klar til salg. ... Vi faxer ordren påny ... Ark ønsker imidlertid en limitering. ...«

Der blev derpå kl. 9.53 fastsat limitering i samråd med sagsøgtes medarbejder Bjarne Bering. EFACEC aktierne blev sat til salg med nærmere angiven limitering. Kl. 10.50 blev ordren sendt pr. telefax til Ark Securities. Aktierne blev ikke solgt.

Den 1. og den 2. februar 1988 blev salgsinstruksen forgæves gentaget.

Den 20. april 1988 kl. 13.37 gentog en medarbejder hos sagsøgte anmodningen om salg af EFACEC aktierne med den tidligere fastsatte limitering, og denne anmodning blev samme dag bekræftet af sagsøgtes medarbejder Claus Jensen.

Det lykkedes at sælge 700 stk. EFACEC aktier. Den 3. maj 1988 fremsendte Fondsbørsvekselerer L. Pedersen I/S en foreløbig afregning på 3.749.552 portugisiske escudos til sagsøgte og tilføjede, at

»Endelig afregning vil blive fremsendt, så snart vi modtager en sådan fra Portugal. ...«

Af ordrebogen fremgår det endelig, at Claus Jensen den 9. maj 1988 kl. 13.30 anmodede om salg af de resterende 500 stk. EFACEC aktier.

Den 13. juni 1988 blev der indgået en låneaftale mellem Fondsbørsvekselerer L. Pedersen I/S og sagsøgte som långiver. Aftalen var en forlængelse af et løbende lån. Af aftalen fremgår det, at lånet udgør 5 mio. kr. Som sikkerhed skal Fondsbørsvekselerer L. Pedersen I/S stille de effekter, som

interessentskabet til enhver tid har beroende i to nærmere angivne depoter.

I de »Almindelige bestemmelser« for lånet hedder det:

»4. a. Pantet tjener til sikkerhed for skadesløs betaling af kapital, renter, provision, sagsomkostninger og andre udgifter, som er afholdt i forbindelse med inddrivelse af skylden i henhold til nærværende kreditaftale.

b. Pantet tjener tillige til sikkerhed for enhver anden forpligtelse, som pantsætter nu har eller måtte få overfor banken ...

8. a.

Håndpantsatte effekter, og hvad der måtte træde i stedet derfor, er banken berettiget til at realisere med 8 dages varsel, på den måde som banken måtte finde tjenlig, herunder også ved underhåndssalg. ...«

Den 21. juni 1988 blev Fondsbørsvekselerer L. Pedersen I/S taget under konkursbehandling.

**764**

Sagsøgeren konstaterede, at de pågældende EFACEC og Amper aktier ikke var hjemtaget, men lå i depot hos udenlandske pengeinstitutter. Sagsøgerens bøger indeholdt nærmere registrering af kunder, derunder sagsøgte, som indehavere af udenlandske værdipapirer; men kundeforholdet med sagsøgte var ikke registreret hos vedkommende udenlandske pengeinstitut. Der var således ikke noteret underkonto (»sub-account«) for sagsøgtes vedkommende.

Den 24. juni 1988 opsagde sagsøgte lånet af 13. juni 1988 og varslede realisation af de effekter, der var deponeret som sikkerhed.

Som omtalt i den foreløbige afregning af 3. maj 1988 fra Fondsbørsvekselerer L. Pedersen I/S afventede man en afregning fra Portugal i anledning af, at 700 stk. EFACEC aktier var blevet solgt. Afregningen indgik først efter konkursen. Ved aktienota af 1. juli 1988 bekræftede sagsøgeren, at man havde afkøbt sagsøgte aktierne for 3.749.552,03 portugisiske escudos omregnet til 174.031,71 kr. Som følge af konkursen blev dette beløb ikke udbetalt til sagsøgte.

Det beløb, der hidrørte fra realisationen af de effekter, som Fondsbørsvekselerer L. Pedersen I/S havde deponeret til sikkerhed, blev den 20. juli 1988 posteret på en sikringskonto hos sagsøgte.

Af fremlagte udskrifter af kontoen fremgår det, at indestående forrentedes med en varierende kreditrente på 6 og 7½%.

Den 5. august 1988 skrev sagsøgte følgende til sagsøgeren:

»*Modregningserklæring.*

Som følge af at nedennævnte portugisiske EFACEC aktier aldrig er blevet leveret fra Deres side tilbageføres disse handler.

Vort tilgodehavende i denne relation opgøres som følger:

| | | |
|---|---|---|
| ... køb, valør 07.10.87, af 200 stk. ... | kr. | 110.488,70 |
| renter heraf 13% i 302 dage | kr. | 11.884,35 |
| ... køb, valør 29.09.87, af 300 stk. ... | kr. | 137.900,89 |
| renter heraf 13% i 310 dage | kr. | 15.225,77 |
| ... køb, valør 29.09.87, af 700 stk. ... | kr. | 293.631,08 |
| renter heraf 13% i 310 dage | kr. | 32.420,09 |

... Sammenlagt giver dette et beløb incl. renter på kr. 601.550,88 som vi har modregnet i L. Pedersens tilgodehavende i idé-banken. ...«

Samme dag gennemførte sagsøgte modregningen ved en postering på den nævnte sikringskonto.

Den 17. august 1988 skrev sagsøgte følgende til sagsøgeren:

»Under henvisning til vedlagte fondsnota skulle De have leveret 133 stk. AC AMPER aktier til os. Idet dette endnu ikke er sket, og da vi i modsætning til EFACEC aktierne, jfr. vort brev af 5. august

1988, er bekendt med at omtalte aktier skulle være i Deres besiddelse, bedes De venligst foranledige disse aktier overført til ABN-Bank i Madrid ... indenfor 14 dage.

Såfremt aktierne ikke overføres indenfor ovennævnte frist vil vi foretage modregning for et beløb svarende til kursværdien af AC AMPER aktierne pr. modregningsdagen. ...«

Ved skrivelse af 25. august 1988 protesterede sagsøgeren mod den gennemførte og den bebudede modregning som nærmere omtalt i sagsøgtes skrivelser af henholdsvis 5. og 17. samme måned.

Den 17. oktober 1988 meddelte sagsøgte, at »... vi har foretaget modregning for kr. 30.874,62 svarende til værdien af de ikke modtagne AC AMPER pr. den 13/10-88, jvf. vores brev af den 17/8-88. ...«

Sagsøgte gennemførte modregningen ved regulering af en sum, som sagsøgte samtidig fremsendte til afgørelse af parternes samlede mellemværende.

Parterne er enige om, at beløbet 30.874,62 kr. er forkert, og at kursværdien pr. 15. juli 1987, 9.190,77 kr., skal lægges til grund.

I skrivelse af 23. oktober 1990 har Ark Securities besvaret nogle spørgsmål stillet af sagsøgerens advokat. Svaret indeholder en opregning af de aktier, som det engelske firma pr. 31. juli 1988 havde i depot for Fondsbørsvekselerer L. Pedersen I/S. Det hedder videre:

»1. Spørgsmål: »Hvilke instruktioner modtog Ark Securities fra L. Pedersen vedrørende de omtalte køb?«

Svar: ... Pedersen gav os instruktioner om at købe og sælge over telefonen. På grund af Pedersens væremåde insisterede vi på at få skriftlige instruktioner fra den 15. januar 1988. Alle handler var for L. Pedersen alene, og vi betegnede kontoen »L. Pedersen, konto for valuta-udlænding« af skattemæssige grunde i England.

2. Spørgsmål: »Har Ark Securities modtaget salgsinstruktioner for de nævnte værdipapirer? ...«

Svar: Vi har ikke modtaget nogen instruktion, der kan udføres, om at sælge de omtalte aktier.

Vi var bekendt med, at Pedersen ønskede at sælge nogle eller alle aktierne, men dette var ikke muligt af to hovedårsager:

a) På grund af et sammenbrud i afviklingssystemet i Portugal var der voldsomme forsinkelser i leveringen af visse aktier til vort depot, og aktierne kunne først sælges, når levering havde fundet sted.

b) Efter børssammenbruddet i oktober 1987... var det kun muligt at sælge meget små mængder til noget der kunne ligne realistiske kurser. Imod vort råd gav Pedersen salgsordrer uden begrænsning i kurs og i størrelser, der lå over markedsvolumen... Fra 15. januar... syntes de at være mere lydhøre over for vor rådgivning, og yderligere mindre ordrer blev udført som tilladt af markedsforholdene.

På den tid oplevede alle investorer forsinkelser i afviklingen og markedsvanskeligheder i Portugal, og

**765**

hverken vi eller Pedersen var herre over disse forhold. Det samme gjorde sig gældende for vore agenter i Portugal. Der kan være grund til at understrege, at selv om det portugisiske afviklingssystem ikke var brudt sammen, og alle aktierne var blevet leveret inden for en rimelig tid, ville det alligevel ikke have været muligt at gennemføre store salg til acceptable kurser efter sammenbruddet på børserne i oktober 1987. Vi rådede derfor på det tidspunkt vore klienter til at beholde deres positioner.

3. Spørgsmål: »Er der indgået skriftlig aftale mellem Ark Securities og L. Pedersen? ...«

Svar: Der var ikke indgået nogen skriftlig aftale mellem Ark Securities og L. Pedersen. Men før Pedersen begyndte at handle gennem os, talte jeg... og ... sendte ham et eksemplar af vor publikation »Investment in Portugal - March 1987« ... Ud fra vore samtaler og denne publikation kan ... Pedersen overhovedet ikke have været i tvivl om det portugisiske handels- og afviklingssystem, risikoen ved at investere på dette marked og de ydelser, Ark Securities kunne give.

4. Spørgsmål: »Blev der givet oplysning om den klient, som L. Pedersen - og Ark Securities - handlede på vegne af?«

Svar: Ark Securities handlede hele tiden udelukkende på L. Pedersens vegne. Vi havde intet kendskab til Pedersens klienter, eller til at de handlede på vegne af klienter. Derfor er der ikke tale om, at Ark Securities handlede på Pedersens klienters vegne.

5. Spørgsmål: »Hvad var fremgangsmåden ved erhvervelse af aktierne?«

Svar: Efter modtagelse af en købsordre fra en klient, gav vi ordre til vores bank i Portugal. Efter modtagelse af telexbekræftelse af den afsluttede handel fra banken, sendte vi telexbekræftelse til klienten samt en børs-/fondsnota. Vi bad så om, at klienten blev frigivet af klienten til os pr. valørdagen. Når vi modtog bekræftelse fra banken, om at aktierne var leveret til vores konto, bekræftede vi leveringen til klienten. I mellemtiden inkluderede vi aktierne i vores månedlige depotudskrift til kunden fra handelsdatoen med angivelse af, at levering endnu ikke var foretaget.

Dette var fremgangsmåden, i det omfang vi var herre over denne. Udførelsen af ordren på markedet, betaling til markedet på valørdagen (ved debitering fra vor portugisiske konto) og endelig afregning førende til levering af aktierne blev foretaget af vores bank, som igen handlede gennem mæglere... på børsen... Som forklaret under pkt. 10 var det på det tidspunkt obligatorisk for en udenlandsk mægler at handle på denne måde gennem en portugisisk bank.

Det er vigtigt at bemærke sig, at den portugisiske fremgangsmåde krævede betaling fra investor, før den del af transaktionen, der førte til endelig levering af aktierne, kunne begynde. Som følge heraf kom spørgsmålet om kontant mod levering ikke på tale for investor.

6. Spørgsmål: »Hvor befandt aktierne sig fysisk efter levering?«

Svar: Vi forstår fra Banco Espirito Santo e Comercial de Lisboa, at aktiebrevene blev opbevaret i deres boksafdeling på hovedkontoret i Lissabon med kreditering på vores konto. ...

8. Spørgsmål: »I hvis navn er aktierne registreret?«

Svar: De omtalte aktier er ihændehaveraktier, som det pågældende selskab ikke fører aktiebog over. ... Alle portugisiske ihændehaveraktier er nummererede, og medens vi forstår, at specifikke nummererede aktier føres under vor konto, fører vi ikke fortegnelse over disse numre eller identificerer beholdningerne. I virkeligheden fungerer ejerforholdet i vore bøger som en del af en pulje af aktier der beror i vort depot i Portugal. ...

9. Spørgsmål: »Angives der underkonto...?«

Svar: Dette var ikke tilfældet for L. Pedersen, der var ikke... nogen underkonto hos Banco Espirito. I London foregik alle vore handler og førtes alle vore bøger udelukkende i L. Pedersens navn.

10. Spørgsmål: »Hvilken korrespondentbank blev brugt til købene?«

Svar: Vores korrespondentbank var Banco Espirito Santo... Udenlandske investorer, der ønskede at handle i Portugal, skulle åbne en konto (inklusive depotfaciliteter) i en portugisisk bank. Banken skulle så anmode den portugisiske nationalbank om tilladelse til at føre kontoen. Vi havde åbnet en sådan konto i Banco Espirito Santo for at have en handels- og depotfacilitet for vore klienter.

11. Spørgsmål: »Var L. Pedersen bekendt med, at der blev anvendt en korrespondentbank?«

Svar: Ja ...

Desuden var Pedersen bekendt med, at de havde et antal valgmuligheder, hvis de ønskede at investere i Portugal.

a) De kunne åbne en konto til afvikling af handler (som under pkt. 10) i Portugal i eget navn.

b) De kunne åbne en konto med underkonto i et klientnavn (eller bede Ark gøre dette).

c) De kunne anvende Arks facilitet under en af dem valgt betegnelse.

d) De kunne vælge en kombination af valgmulighederne i a), b) eller c).

Pedersen meddelte os, at de ønskede at handle via vores konto i eget navn.

12. Spørgsmål: »Blev ordrer til korrespondentbanker afgivet i Ark Securities' [eller] L. Pedersens ... navn?«

Svar: Ordrerne blev afgivet til Banco Espirito i vort navn. Alle ordrer effektueret gennem vores konto hos Banco Espirito skulle udelukkende være i vort navn. ...

14. Spørgsmål: »Hvilken dokumentation modtog Ark Securities i forbindelse med handlerne, og hvilken dokumentation modtog L. Pedersen?«

Svar: Ark Securities modtog telexbekræftelse af

**766**

handler fra Portugal, og vi modtog forskellige former for dokumentation vedrørende levering af aktier til vort depot. Pedersen modtog telexbekræftelse fra os, børs-/fondsnota, betalingsinstruktioner og en månedlig udskrift udvisende værdipapirerne i depotet. ...«

I skrivelse af 5. marts 1991 har den spanske Banco Santander besvaret nogle spørgsmål ligeledes stillet af sagsøgerens advokat. Af skrivelsen fremgår følgende:

»... 1. Spørgsmål: »Hvilke instruktioner modtog Banco Santander fra L.P. vedrørende de omtalte køb?«

Svar: ... alle købene af aktiver foregik i henhold til L.P.s telefoniske instruktioner. ...

3. Spørgsmål: »Er der indgået skriftlig aftale mellem Banco Santander og L.P.? ...«

Svar: Der var ikke indgået nogen skriftlig aftale mellem Banco Santander og L.P.

4. Spørgsmål: »Blev der givet oplysning om den klient, som B.S. og L.P. handlede på vegne af?«

Svar: Banco Santander gennemførte alle former for handler blot i navnet L.P. Vi fik ikke yderligere oplysninger om L.P.s klients identitet. ...

6. Spørgsmål: »Hvor befandt aktierne sig efter levering?«

Svar: De fysiske aktiver blev indlagt i L.P.s depot hos os i Banco Santander. ...

8. Spørgsmål: »I hvis navn er aktierne registreret?«

Svar: Alle aktierne er indlagt under L. Pedersens registrerede navn.

9. Spørgsmål: »Angives der underkonto...?«

Svar: Der findes ingen underkonto.

10. Spørgsmål: »Hvilken korrespondentbank blev brugt til købene?«

Svar: Banco Santander var korrespondentbank for købet. Banken sørgede for værdipapirer og afvikling. Vor merchant bank »Banco Santander de Negocios« førte afkastkontoen i L. Pedersens registrerede navn.

11. Spørgsmål: »Var L.P. bekendt med, at der blev anvendt en korrespondentbank?«

Svar: Ja, vi var deres korrespondentbank.

12. Spørgsmål: »Blev ordrer til korrespondentbanker givet i Banco Santanders [eller] L. Pedersens ... navn?«

Svar: Alle ordrer blev effektueret gennem os i L. Pedersens navn. ...

14. Spørgsmål: »Hvilken dokumentation modtog Banco Santander i forbindelse med handlerne, og hvilken dokumentation modtog L.P.?«

Svar: Som nævnt ovenfor, modtog vi ingen dokumentation fra L. Pedersen. På den anden side sendte vi dem følgende dokumentation:

- Telexbekræftelse på alle former for transaktioner.

- Debet/kredit advis på transaktionen.

- Oplysninger om finansielle transaktioner. ...«

I skrivelse af 9. juni 1993 har Foreningen af Danske Børsmæglerselskaber besvaret spørgsmål i anledning af sagen således:

»Bestyrelsens svar vedrører, medmindre andet er anført, de forhold, der var gældende for danske fondsbørsvekselerere og børsmæglerselskaber. Kutymerne var de samme, og der anvendes i det følgende som hovedregel betegnelsen fondsbørsvekselerer.

*Spørgsmål 1.* Kan der på det aktuelle tidspunkt påvises kutymer ved a) køb, b) salg, c) opbevaring af udenlandske værdipapirer, som et dansk vekselererfirma (børsmæglerselskab) har købt i udlandet via udenlandske forbindelser?

*Svar:* Der var i perioden 1987/88 en række kutymer ved køb, salg og opbevaring af udenlandske værdipapirer, som et dansk fondsbørsvekselererfirma eller et dansk børsmæglerselskab har købt i udlandet via udenlandske forbindelser.

Køb af værdipapirer i udlandet skete som hovedregel gennem en udenlandsk forbindelse, der for fondsbørsvekseleren erhvervede papirerne i markedet eller ved en emission. Det var ikke ualmindeligt at der indskudt flere led.

Som hovedregel blev udenlandske værdipapirer ikke udleveret til kunden, men forblev i depot enten hos fondsbørsvekseleren eller i udlandet. Denne praksis havde sammenhæng med reguleringen af valutaforhold, som i øvrigt i august 1988 blev gennemgribende ændret.

Når værdipapirer skulle anbringes i depot i udlandet, var det som hovedregel fondsbørsvekselerens beslutning, at papirerne skulle anbringes i depot i udlandet. Fondsbørsvekseleren valgte normalt depotstedet, uden at kunden havde indflydelse på valget.

Det var almindeligt, at depotet kunne rumme værdipapirer tilhørende flere kunder og værdipapirer tilhørende fondsbørsvekselererfirmaet. Uanset dette var det almindeligt, at depotet udelukkende lød på fondsbørsvekselererens navn.

Det var ikke ualmindeligt, at værdipapirer ikke lå i depot hos fondsbørsvekselererens direkte forbindelse i udlandet, men at denne forbindelse havde papirerne liggende i depot hos en anden fondshandlere eller pengeinstitut.

Når værdipapirerne blev lagt i depot i udlandet var det ikke almindeligt, at kunden modtog nogen form for depotbevis eller udskrift fra det udenlandske depotsted.

Der kunne ofte gå meget lang tid fra handelsdagen til værdipapirerne blev leveret. Hvor lang tid der gik, var afhængigt af regler og praksis for afvikling i det land, hvor papirerne blev købt og af, hvor mange led der var indskudt i kæden.

Det var almindeligt, at kunden betalte for købet umiddelbart efter handelens indgåelse, uanset hvornår værdipapirerne blev leveret fra sælger til det af fondsbørsvekseleren udpegede depot.

**767**

Kundens dokumentation for handelens udførelse, betaling og depotplaceringen var som hovedregel udelukkende fondsbørsvekselererens egen meddelelse til kunden.

Hvorvidt kunden kunne videresælge udenlandske værdipapirer umiddelbart efter handelsdagen, eller om kunden skulle afvente, at de var leveret til det udpegede depot, af hang af fondsbørsvekseleren. Det normale var, at kunden kunne handle, uanset om levering havde fundet sted.

*Spørgsmål 2.* Kan der anses for sædvanligt og/eller stemmende med god skik indenfor branchen, at de af et vekselererfirma til kunder indkøbte aktier forblev henliggende i det opbevarende pengeinstitut i vekselererfirmaets navn?

*Svar:* Det var sædvanligt og betragtedes som stemmende med god skik blandt fondsbørsvekselerere og børsmæglerselskaber, at de indkøbte aktier forblev henliggende i det opbevarende pengeinstitut i vekselererfirmaets navn.

Finanstilsynet har i en skrivelse af 21. december 1988 til Danmarks Sparekasseforening udtalt sig om spørgsmålet om adskillelse af depoter med egenbeholdning fra kundedepoter i udenlandske depotbanker. ...

Denne skrivelse blev først fremsendt i kopi til Foreningen af Danske Børsmæglerselskaber den 23. januar 1992. Skrivelsen blev derefter i kopi udsendt til alle børsmæglerselskaber. Skrivelsen blev ikke fremsendt til fondsbørsvekselererne inden disse forsvandt med udgangen af 1988, hvor de sidste bestemmelser i fondsbørsreformen fra 1986 blev sat i kraft.

Adskillelse af kundedepoter og egendepoter i udenlandske depotbanker og markering af depoter med andre navne end fondsbørsvekselererens eget, var således ikke stridende mod god skik blandt fondsbørsvekselerere og børsmæglerselskaber i 1987/88.

*Spørgsmål 3.* Spiller det ved besvarelsen af spørgsmål 2 nogen rolle, at der, som tilfældet var med portugisiske aktier, var indskudt et yderligere mellemled, og at de pågældende aktier beroede som en del af en pulje, tillige omfattende andre aktier, der var indkøbt til andre kunder, der havde benyttet det pågældende udenlandske firma som mellemled?

*Svar:* Det har ikke spillet nogen rolle ved besvarelsen af spørgsmål 2, om der var indskudt et yderligere mellemled eller værdipapirer beroede som en del af en pulje. Det forekom, at den danske fondsbørsvekselerere ikke vidste, om der var yderligere mellemled.

*Spørgsmål 4.* Må det anses for sædvanligt og/eller stemmende med god skik indenfor branchen at undlade at oprette underkonto eller angive anden identifikation, hvorved det opbevarende pengeinstitut og/eller det medvirkende mellemled registrerer det bestående kundeforhold/hvem aktierne tilhører?

*Svar:* Det var i den pågældende periode almindeligt at undlade at oprette underkonto eller angive anden identifikation, så det opbevarende pengeinstitut eller et medvirkende mellemled ikke registrerede, at der var tale om et kundeforhold endsige kundens identitet.

Se i øvrigt svaret på spørgsmål 2.«

I den omtalte skrivelse af 21. december 1988 fra Finanstilsynet til Danmarks Sparekasseforening hedder det blandt andet:

»Foreningen anfører ..., at der af hensyn til problemer, der kan opstå omkring sparekassens soliditet, bør depotkonti i den udenlandske depotbank, en for sparekassens egne værdipapirer og en for kundens værdipapirer, således at der i tilfælde af sparekassens konkurs ikke kan rejses tvivl hos depotbanken om, hvilke papirer der tilkommer trediemand, selvom denne stilling måtte kunne statueres alene baseret på sparekassens bogføring.

I denne anledning skal tilsynet udtale:

... tilsynet anser det for påkrævet, at der i depotbanken sker en klar adskillelse mellem de værdipapirer, der tilhører sparekassen, og de værdipapirer, der tilhører sparekassens kunder. Det bemærkes, at tilsynet ikke hermed har taget stilling til spørgsmålet, hvorvidt en sikring af deponenten imod tab i tilfælde af sparekassens konkurs måtte kræve foranstaltninger herudover.«

Parterne er enige om, at Fondsbørsvekselerer L. Pedersen I/S ved konkursens indtræden ikke havde nogen egenbeholdning af EFACEC og Amper aktier.

Sagsøgerens krav, 632.425,50 kr., er summen af de modregnede beløb 601.550,88 kr. og 30.874,62 kr.

Sagsøgtes påstande fremkommer således:

1) Den principale påstand: Beløbet 21.683,85 kr. er forskellen mellem det foglagtige beløb, 30.874,62 kr., og beløbet 9.190,77 kr., hvis størrelse der som nævnt er enighed om.

2) Den subsidiære påstand: Parterne er enige om, at aktierne pr. konkursdagen den 21. juni 1988 havde en samlet kursværdi på 301.848,48 kr. Beløbet 330.577,02 kr. er forskellen mellem denne

kursværdi og det samlede beløb, 632.425,50 kr., som sagsøgte har modregnet.

3) Den mere subsidiære og den mest subsidiære påstand: Beløbet 458.393,79 kr. er forskellen mellem vederlaget for salget af 700 stk. EFACEC aktier, 174.031,71 kr., og det samlede beløb, 632.425,50 kr., som sagsøgte har modregnet.

Der er afgivet vidneforklaring af regnskabschef Per Bach Sørensen, intern controller Jørgen Eker, direktør Mogens Pihl og aktiehandler Claus Jensen.

Per Bach Sørensen har forklaret blandt andet, at han havde været ansat hos Fondsbørsvekselerer L. Pedersen I/S siden 1. april 1986. Han tog sig af daglig registrering, rapportering og regnskabsfunktioner. Han var i kontakt med blandt andre sagsøgte. Han deltog ikke i handelen med aktier, men fulgte de indgåede handler papirmæssigt

op. Han hørte først efter konkursen, at der havde været problemer med afviklingen af EFACEC og Amper aktierne.

Man arbejdede med, at kundeunderlaget skulle være noteret på sub-accounts i udlandet. Vidnet syntes egentlig ikke, at dette var nødvendigt; Fondsbørsvekselerer L. Pedersen I/S kunne selv øremærke papirerne. Men »det var oppe i tiden«, at man skulle individualisere »for en sikkerheds skyld«. Værdipapircentralens måde at registrere på gjorde det naturligt at registrere på tilsvarende måde i udlandet. Pengeinstitutterne havde også i praksis med at notere på sub-account. Vidnet havde hørt foredrag herom.

Jørgen Eker har forklaret blandt andet, at han blev ansat hos Fondsbørsvekselerer L. Pedersen I/S i august 1982. Vidnet var »handler« og beskæftigede sig mest med aktier, derunder udenlandske. En typisk handel med udenlandske aktier starter med bestilling fra en kunde. Fondsbørsvekselerer L. Pedersen I/S henvender sig så til sin lokale forbindelse, en bank eller vekselerer. De portugisiske EFACEC aktier er dog handlet gennem en engelsk mægler, Ark. EFACEC aktierne blev »utroligt langsomt«. Han førte en ordrebog vedrørende udenlandske aktier. Tilførslen pr. 11. november 1987 betyder, at Claus Jensen har bedt om, at de 1.200 EFACEC aktier måtte blive solgt bedst muligt. Vidnet mente, at når købet ikke var på plads, kunne man ikke sælge. Det var almindelig forretningsgang at ringe til Ark og bekræfte ordren med telex. Der var problemer med Ark i forbindelse med handlen. Vidnet orienterede sagsøgte løbende om vanskelighederne. Sagsøgte var vel ikke tilfreds, men tog orienteringen til efterretning. Den 27. januar 1988 blev der aftalt limitering, fordi Ark ville have en mindstepris, som man kunne sælge for uden at sørge Fondsbørsvekselerer L. Pedersen I/S. På et tidspunkt solgte man 700 EFACEC aktier. Vidnet var meget muligt indblandet i salget, men husker det ikke nærmere. Når der var blevet købt aktier i udlandet, blev aktierne efter omstændighederne noteret på kundens navn. Nogle kunder ønskede for at få større sikkerhed notering på sub-account, andre ikke. Sagsøgte havde ikke stillet et sådant krav. Man gjorde på dette punkt kun, hvad man var bedt om. Hvis der blev forlangt notering af sub-account, kunne man give sin udenlandske forbindelse besked på at sørge for noteringen. Man kunne altid af Fondsbørsvekselerer L. Pedersen I/S's bogholderi se, hvem der ejede aktierne.

Vidnet er bekendt med et notat, som sagsøgtes advokat har udfærdiget den 8. januar 1988. Notatet former sig som et brev stilet til vidnet. Af notatet fremgår nærmere, at der opnås sikkerhed ved at notere sub-account. Notatet gav dog ikke anledning til en generel praksisændring. Et »bedst muligt«-salg gennemføres normalt hurtigt, men efter omstændighederne kan der gå længere tid. Vidnet husker, at der var børskrak i 1987. Sagsøgtes ordre om at sælge aktierne kan godt hænge sammen med krakket. Normalt kunne man

have forventet hurtigt salg. Men det pågældende marked var nyt og ikke særlig stort. Det var sagsøgte også klar over. Vidnet husker ikke, hvem der fandt på at introducere portugalpapirerne.

Mogens Pihl har forklaret blandt andet, at han tiltrådte som direktør hos sagsøgte den 1. november 1987. Sagsøgtes ønske at sælge aktierne efter børskrakket. Man meddelte Fondsbørsvekselerer L. Pedersen I/S, at man ville sælge, men efter to dage blev der svaret, at aktierne ikke var til stede. Der er nok en lidt længere afviklingsperiode - 14 dage - i de sydlige lande, men vidnet har aldrig været ude for, at man ikke kunne sælge aktierne. Forud for ansættelsen hos sagsøgte havde vidnet været beskæftiget i et vekselererfirma. I sagsøgtes bestyrelse besluttede man at »køre hårdt på«. Han kontaktede Fondsbørsvekselerer L. Pedersen I/S. Til slut ville sagsøgte ikke vedstå handlen, når man ikke kunne få papirerne. Vidnet talte i telefon med direktør Steffen Rasmussen hos Fondsbørsvekselerer L. Pedersen I/S, der også var utilfreds med, at man ikke kunne levere aktierne. Den 18. december 1987 blev der sendt et brev til Fondsbørsvekselerer L. Pedersen I/S om handlen, og det var den sidste dag, hvor sagsøgte var indstillet på salg med valør pr. 3. samme måned, hvilken dato man havde kendskab til kursen. Man sagde vist allerede i januar måned, at man ikke ville vedstå handlen. Det er rigtigt, at der siden blev solgt 700 EFACEC aktier, og at man den 9. maj 1988 gav besked om at sælge de resterende 500. Men på dette tidspunkt havde sagsøgte for længst sagt til Fondsbørsvekselerer L. Pedersen I/S, at »man ikke ønskede at have noget forhold til de aktier«. Det er også rigtigt, at der var salgsbestræbelser i januar-februar 1988. Til denne aktivitet kan vidnet kun sige, at sagsøgte gerne ville sælge, når Fondsbørsvekselerer L. Pedersen I/S var af den opfattelse, at sagsøgte var forpligtet til at vedstå handlen. Salgsbestræbelserne må altså ses på baggrund af sagsøgtes ønske om at begrænse tabet, men vidnets standpunkt kan være udtryk for efterrationalisering. Vidnet mener, at de indkøbte aktier blev anbragt i sagsøgtes depot i udlandet, men der var ingen skriftlige aftaler med Fondsbørsvekselerer L. Pedersen I/S om fremgangsmåden. Vidnet havde i hvert fald en forventning om, at det var registreret hos den udenlandske bank, at sagsøgte var ejer. Efter at sagen opstod, har man nøje drøftet, hvordan man skal forholde sig med udenlandske aktier. Vidnet har sandsynligvis set den foreløbige afregning af 3. maj 1988, men husker det ikke. Sagsøgte afgav sin modregningserklæring den 5. august 1988. Det var først på dette tidspunkt, at man gjorde sit pengekrav op. Handlen var imidlertid allerede blevet hævet forinden. Det er vel rigtigt, at man tidligere skriftligt blot »forbeholdt« sig at hæve. Men vidnet havde dog indimellem sagt til Steffen Rasmussen, at sagsøgte ville hæve. Den sats på 13%, der er grundlaget for

**769**

rentedebiteringen, er valgt som udtryk for, at der er tale om morarenter. Kravet på 601.550,88 kr. blev kun debiteret på sikringskontoen, fordi der var overskud på denne konto. Kontoen er sagsøgtes sikkerhed for engagementet; sagsøgeren kunne derfor ikke disponere over den. Sagsøgte mistede ikke sikkerheden i de 5 mio. kr., der fremkom ved at realisere sikkerhedsdepoter, ved at lade denne pengesum indgå på sikringskontoen.

Claus Jensen har forklaret blandt andet, at han blev ansat hos sagsøgte i august 1986 og fratrådte i december 1990. I starten var vidnet aktieanalytiker. I efteråret 1987 fik han ansvaret for sagsøgtes egenbeholdning af danske og udenlandske aktier. Vidnet købte EFACEC aktier til egenbeholdningen og anbefalede nogle kunder hos sagsøgte at gøre tilsvarende indkøb. Kundegrundlaget var begrænset. Det portugisiske marked er spekulativt. Det var oprindelig Fondsbørsvekselerer L. Pedersen I/S, der anbefalede det portugisiske marked. Sagsøgte ville af med aktierne, da der kom

børskrak i USA. Vidnet ringede til Fondsbørsvekselerer L. Pedersen I/S og sagde, at man ville sælge. Der var intet limit for salget. »Bedst muligt«-ordrer bliver normalt faktureret samme dag eller dagen efter. »Følsomme papirer« handles vel i løbet af en uge. Vidnet fik at vide - vistnok senere end november 1987 - at man ikke kunne sælge, fordi aktierne ikke var til rådighed. Det havde vidnet aldrig før eller siden prøvet. Senere blev der sat limit på. Vidnet kender ikke baggrunden, men det skete på Fondsbørsvekselerer L. Pedersen I/S's anbefaling. Pihl bad Fondsbørsvekselerer L. Pedersen I/S om at tage aktierne tilbage, men vidnet husker ikke, hvornår det skete. I april/maj 1988 vidste sagsøgte ikke, »hvem der havde retten på sin side. Salgsbestræbelserne skal ses i det lys; vidnet husker ikke præcis, hvorledes det forløb, men det ville i hvert fald være normalt at reagere som sket. Vidnet husker ikke, om han så den foreløbige afregning af 3. maj 1988. Han vidste ikke, hvor i verden aktierne fysisk befandt sig. Det er kutyme, at der oprettes et depot i den udenlandske bank eller hos den udenlandske mægler. Vidnet vidste oprindeligt ikke, at Fondsbørsvekselerer L. Pedersen I/S benyttede en engelsk mægler til at indkøbe de portugisiske papirer. Vidnet stillede ikke krav om notering af sub-account i forbindelse med indkøbene, og spørgsmålet blev vist ikke berørt senere.

Sagsøgeren har til støtte for sine påstande gjort gældende, at modregningen er uberettiget, principalt fordi sagsøgte ikke har været berettiget til at ophæve den indgåede handel, subsidiært fordi modregning er udelukket efter konkurslovens § 42, stk. 1, idet sagsøgte ikke på tidspunktet for konkursdekretets afsigelse havde et krav, der kunne begrunde modregning, og fordi modregning vedrørende den etablerede sikringskonto er udelukket.

Sagsøgeren har nærmere anført, at Fondsbørsvekselerer L. Pedersen I/S har opfyldt aftalen om tilbagekøb af aktierne. Ophævelsen er først sket over for sagsøgeren efter konkursen. Den er herefter uberettiget. Sagsøgte krævede ikke notering af sub-account, og derfor kan det lægges til grund, at sagsøgte var indforstået med, at aktierne forblev i udlandet. Der er tale om professionelle parter, og der foreligger et generisk bestemt handelskøb angående negotiable aktier. Sagsøgte havde faktisk disponeret over 700 af EFACEC aktierne, og det fremgår da også af udtalelsen fra Foreningen af Danske Børsmæglerselskaber, at det normale var, at kunden kunne handle, uanset om levering havde fundet sted. Sagsøgtes medarbejder, vidnet Jensen, har forklaret, at sagsøgte ville af med aktierne, da der kom børskrak.

Hvis levering må anses for at være sket for sent, har sagsøgte dog fortabt hævebeføjelsen. Det følger af købelovens § 27, at sagsøgte, hvis man ønskede at hæve købet, uden ugrundet ophold skulle afgive specificeret reklamation, således at ophævelsen blev fremhævet for Fondsbørsvekselerer L. Pedersen I/S, men dette er ikke sket. Det bestrides, at ophævelse er sket mundtligt. Der er på senere tidspunkter i begivenhedsforløbet givet salgsinstruks, og senest viser sagsøgtes anmodning af 17. august 1988 om overførelse af aktier til sagsøgtes spanske bankforbindelse, at man fortsat anså sig for berettiget til aktierne.

Reglerne om kommission er uden betydning. Da aktierne var erhvervet, ophørte kommissionsforholdet og afgaves et af administrationsforhold. Det skyldtes valutabestemmelser, at aktierne forblev, hvor de var i udlandet. Alskylds-erklæringen gjaldt Fondsbørsvekselerer L. Pedersen I/S's driftskredit og kan ikke anvendes på mellemværendet vedrørende aktierne.

Sagsøgte har ikke krav på erstatning, for det fremgår af udtalelsen fra Foreningen af Danske Børsmæglerselskaber, at Fondsbørsvekselerer L. Pedersen I/S har optrådt i enhver henseende normsvarende. Vidnet Jensen har forklaret, at det portugisiske

marked er spekulativt, og at han ikke stillede krav om notering af sub-account.

Sagsøgte havde ifølge aftale ret til aktierne, men konkursen medfører, at det er reglerne om ejendomsrettens overgang, der skal anvendes. Afgørende er herefter, om der er sket fornøden individualisering, således at man kan identificere de værdier, der er sagsøgtes. Sagsøgtes portugisiske aktier lå i en pulje og udgjorde en andel af puljen. Det havde været ganske enkelt at registrere på sub-account. Af udtalelsen fra Ark Securities fremgår det, at man kunne åbne en konto med underkonto i et klientnavn eller bede Ark gøre det. Der var ganske vist på konkurstidspunktet overensstemmelse mellem vekselererfirmaets og sagsøgtes bøger. Men denne omstændighed er ikke ensbetydende med individualisering, for det var ikke muligt at udskille sagsøgtes værdier. Relevant sikringsakt havde været en underretning til det opbevarende pengeinstitut om, at der var tale om kundedepoter. Det burde også have været specificeret i Fondsbørsvekselerer L.

**770**

Pedersen I/S's bøger, hvilke aktienumre der var købt. Sagsøgte har herefter ikke separatiststilling i det sagsøgende bo. Det er vel rigtigt, at sagsøgeren i en vis forstand får en berigelse ved at beholde såvel købesum som aktier, men berigelsen er ikke ugrundet, for resultatet følger af kreditorernes adgang til retsforfølgning.

Sagsøgtes modfordring var et krav på at få udleveret værdipapirerne. Hovedfordringen var et pengekrav. Modregning er herefter udelukket på grund af fordringernes beskaffenhed, jf. konkurslovens § 42, stk. 1. Det gælder også kravet på salgssummen for de aktier, der blev solgt, for dette krav blev først omsat til penge efter konkursdekretet.

Sikringskontoen var forrentet i overensstemmelse med, hvad der er sædvanligt mellem professionelle inden for pengeverdenen. Sagsøgeren har bevist, at man ifølge stiltiende aftale med Fondsbørsvekselerer L. Pedersen I/S eller efter kutyme har krav på rente også inden sagsanlæg.

Sagsøgte har til støtte for sine påstande gjort gældende, at handlen har kunnet hæves på grund af manglende eller forsinket levering. Sagsøgte har desuden krav på erstatning af negativ kontraktsinteresse. Subsidiært støttes erstatningskravet på et almindelig culpabetragtning. Mere subsidiært har sagsøgte gjort gældende, at der ikke er tale om modregning, men om fyldestgørelse i håndpantsatte aktiver.

Sagsøgte har nærmere anført, at aktierne aldrig er leveret. Erhververen af en aktie har krav på, at der iagttages sådanne formkrav, at han bliver formelt legitimeret. Er der som i sagen tale om ihændehaveraktier, har erhververen krav på at få aktierne i hænde; men det er ikke sket. Det er muligt, at Fondsbørsvekselerer L. Pedersen I/S har foretaget sig, hvad der efter det oplyste er kutyme, men der er ikke taget stilling til, hvad der kutymemæssigt påhviler overdrageren i henseende til at sikre erhververens kreditorbeskyttelse. Spørgsmålet om, hvorvidt levering har fundet sted, må bedømmes efter almindelige køberetlige regler og ikke på grundlag af de kutymer, der ensidigt meddeles af vekselererbranchen. Sagsøgte havde ingen indflydelse på valget af deponeringssted og -måde. Det er uden betydning, at sagsøgte ikke selv bad om notering af sub-account; sagsøgte vidste netop ikke, hvorledes man håndterede aktierne. Hvis behørig levering var sket, havde der været oprettet et depot, således at kreditorbeskyttelsen havde været indiskutabel. Ophævelsen skete allerede ved vidnet Pihls mundtlige erklæring om, at man ikke ønskede at have aktierne, eller dog i hvert fald ved modregningserklæringerne.

Hvis levering imidlertid er sket, er den sket for sent, fordi enhver forsinkelse i det indgåede handelskøb er væsentlig, jf. købelovens § 21, stk. 3. I øvrigt kan også andre omstændigheder end den ikke

rettidige levering konstituere misligholdelse, således at princippet i købelovens § 21 kan finde anvendelse. Det er således hævebegrundende, at sagsøgeren ikke har villet udlevere aktierne og ikke har villet afregne provenuet for de aktier, der blev solgt.

Parternes mellemværende er et kommissionsforhold, jf. kommissionslovens § 4. Sagsøgte havde selvfølgelig som udgangspunkt pligt til at reklamere i anledning af forsinkelsen, jf. lovens § 23, men sagsøgtes forpligtelse er ikke udstrakt til at gælde under de foreliggende omstændigheder, jf. § 24, fordi Fondsbørsvekselerer L. Pedersen I/S optrådte groft uagtsomt, jf. nedenfor, hvilket medførte betydelig skade for sagsøgte.

Sagsøgeren bærer et erstatningsansvar, fordi Fondsbørsvekselerer L. Pedersen I/S optrådte culpøst og derunder udviste en uagtsomhed, der må betegnes som grov. Vekselererfirmaet burde have sikret sig sagsøgtes ejendomsret og oprettet et selvstændigt depot eller foranlediget noteret sub-account. Dette var man ganske på det rene med. Vidnet Sørensen havde hørt foredrag om sådan notering, og vidnet Eker var bekendt med notatet af 8. januar 1988. Af oplysningerne fra Ark Securities fremgår, at Fondsbørsvekselerer L. Pedersen I/S kunne åbne en konto med underkonto i et klientnavn (eller bede Ark gøre dette), men man meddelte, at man ønskede at handle via Arks konto i eget navn. Fondsbørsvekselerer L. Pedersen I/S forsømte sin pligt til at holde aktierne adskilt fra andet gods, jf. kommissionslovens § 10, stk. 1. Man var klar over, at det spanske og portugisiske marked var risikabelt, men undlod at orientere sagsøgte derom. Af udtalelsen fra Foreningen af Danske Børsmæglerselskaber fremgår, at det normale var, at kunden kunne handle, uanset om levering havde fundet sted. Dette var også sagsøgtes mening, men Fondsbørsvekselerer L. Pedersen I/S undlod at træffe de fornødne foranstaltninger.

Sagsøgtes tab må opgøres svarende til købesummen med renter, fordi sagsøgte skal stilles, som om handlen ikke var indgået. Kursen pr. konkursdagen er irrelevant, fordi sagsøgte ikke skal bære kursrisikoen.

Sagsøgte har fyldestgjort sig for kravet i anledning af misligholdelsen ved gennem modregning at holde sig til sikringskontoen, der ikke berøres af konkursen, jf. konkurslovens § 91, stk. 1. Det er rigtigt, at sikkerhedsretten primært sigtede til Fondsbørsvekselerer L. Pedersen I/S's driftskredit, men låneaftalen indeholdt en alskylds-erklæring. I øvrigt er modregning mellem de bestående pengekrav i overensstemmelse med konkurslovens § 42, stk. 1, fordi sagsøgtes krav er stiftet ved kontraktens indgåelse og således erhvervet inden konkursen.

Sagsøgtes subsidiære påstand er udtryk for en kompensationsbetragtning. Tabet må fastsættes skønsmæssigt under hensyn til Fondsbørsvekselerer L. Pedersen I/S's viden om det risikable marked og til, at sagsøgte selv har været afskåret fra at disponere og begrænse tabet. Sagsøgeren kan højst opnå at beholde aktierne og

**771**

salgsprovenuet, således at sagsøgte bærer kurstabet, for sagsøgeren kan højst stilles, som om aktiehandlerne var opfyldt. I modsat fald opnår sagsøgeren en ugrundet berigelse.

Den mere subsidiære påstand er udtryk for, at sagsøgtes separatiststilling med hensyn til de usolgte aktier anerkendes. Det må lægges til grund, at forskellige konti i Spanien og Portugal samt hos Ark Securities, Fondsbørsvekselerer L. Pedersen I/S og sagsøgte stemte overens. Parterne var klar over, at der var tale om kundedepoter. Ved konkursen var der ingen aktier, der tilhørte Fondsbørsvekselerer L. Pedersen I/S selv. At de udenlandske depoter var oprettet i Fondsbørsvekselerer L. Pedersen I/S's navn, var en praktisk, rent formel foranstaltning.

Den mest subsidiære påstand indebærer, at sagsøgte i henhold til sikkerhedsret fyldestgør sig for kravet på salgssummen for de aktier, som det lykkedes at afhænde. Også for så vidt angår de to sidstnævnte påstande gør sig en kompensationsbetragtning gældende, jf. ovenfor.

Det bestrides, at sagsøgeren har grundlag for rente inden sagsanlæg.

### Rettens bemærkninger:

Det lægges til grund, at sagsøgtes ordrer om at sælge aktierne blev fastholdt, indtil modregning skete. Sagsøgte findes ikke at have bevist, at der blev afgivet ophævelseserklæring under de mundtlige drøftelser med Fondsbørsvekselerer L. Pedersen I/S. Sagsøgte findes under disse omstændigheder at være indgået på at anse de indkøbte aktier for leveret. Sagsøgte er derfor ikke berettiget til at få købesummen tilbage.

På baggrund af erklæringen fra Foreningen af Danske Børsmæglerselskaber findes sagsøgte ikke at have godtgjort, at Fondsbørsvekselerer L. Pedersen I/S ifølge aftalen skulle oprette underkonto eller lignende til registrering af, hvem aktierne tilhørte. Da det ej heller findes godtgjort, at vekselererfirmaet på anden måde har misligholdt kontrakten, tilkommer der ikke sagsøgte erstatning.

Sagsøgtes aktier henlå sammen med aktier, der ejedes af andre, uden nærmere oplysninger om tilhørsforholdet. Under de foreliggende omstændigheder findes sagsøgtes ejendomsret - uanset overensstemmelsen mellem vekselererfirmaets og sagsøgtes bøger - ikke at kunne opretholdes over for det sagsøgende konkursbo, fordi der ikke var sket tilstrækkelig individualisering af, hvad der var bestemt til opfyldelse af aktiehandlerne.

Kravet på købesummen for de solgte aktier må anses for sikret i henhold til aftalen af 13. juni 1988. Sagsøgte findes at have været beføjet til at fyldestgøre sig for kravet, jf. konkurslovens § 91, stk. 1.

Da sagsøgeren ikke findes at have godtgjort kravet på morarente inden sagsanlæg, gives der dom i overensstemmelse med sagsøgtes mest subsidiære påstand.

- - -

Sagsøgte, EPA Bank A/S, tidligere Idé-Banken A/S, betaler til sagsøgeren, Fondsbørsvekselerer L. Pedersen I/S under konkurs ved kuratorerne, advokaterne Pernille Bigaard, Peter Bøgelund og Steen Klein, sagens omkostninger med 35.000 kr.

### Højesteret

### Højesterets dom.

Den indankede dom er afsagt af Østre Landsret.

I pådømmelsen har deltaget syv dommere: Kiil, Hornslet, Marie-Louise Andreasen, Poul Sørensen, Blok, Jørgen Nørgaard og Børge Dahl.

Appellanten, Finansrådet som mandatar for Administrationsselskabet af 2. april 1990 A/S, har for Højesteret nedlagt påstand om, at indstævnte, Fondsbørsvekselerer L. Pedersen I/S under konkurs, til administrationsselskabet skal udlevere de omhandlede 500 stk. EFACEC aktier og 133 stk. Amper aktier med de under konkursbehandlingen oppebårne udbytter mod betaling af de 458.393,79 kr. med procesrente fra sagens anlæg, som konkursboet er tilkendt ved landsrettens dom.

Konkursboet har påstået stadfæstelse.

For Højesteret angår sagen således alene, om administrationsselskabet som separatist har krav på udlevering af aktierne.

Under sagens behandling for Højesteret har parterne været enige om kun at belyse faktum vedrørende EFACEC aktierne og om, at

der ved afgørelsen vedrørende Amper aktierne kan lægges et tilsvarende faktum til grund.

Der foreligger fondsnotaer udstedt af vekselererfirmaet til Idé-Banken »vedrørende vort salg til Dem« af henholdsvis 300, 700 og 200 stk. EFACEC aktier. Fondsnotaerne indeholder angivelse af bl.a. valørdato, papirnavn, antal, kursværdi og det beløb, banken skulle betale i danske kroner. Parterne er enige om, at disse notaer er sendt til banken senest samtidig med, at vekselererfirmaet over for Ark Securities afgav bestilling om køb af aktierne. På valørdagen - eller dagen før - sendte banken til vekselererfirmaet bekræftelsesnota - »købt af Dem« - indeholdende overensstemmende angivelser om valørdato, papirnavn, antal, kursværdi og det beløb, banken skulle betale i danske kroner. Parterne er enige om, at pengene umiddelbart efter modtagelsen hos vekselererfirmaet blev videresendt til Ark, der således har haft beløbene stående i et depot til sikkerhed for den af Ark afgivne købsordre over for den portugisiske bank. Der foreligger desuden fondsnotaer fra vekselererfirmaet til banken »vedrørende vort køb af Dem i kommission« af 700 stk. EFACEC aktier.

Der foreligger endvidere notaer vedrørende EFACEC aktier udstedt af Ark til vekselererfirmaet om henholdsvis »You have today bought from ourselves as principals...« og »We have today sold on your behalf...« samt depotmeddelelser fra Ark til vekselererfirmaet vedrørende vekselererfirmaets »safe custody account« hos Ark med

### 772

bekræftelse af, at »we hold the following securities on your behalf«. Der er indbyrdes overensstemmelse mellem købs- og salgsnotaerne samt depotmeddelelserne.

Der foreligger endelig depotkontoudtog fra vekselererfirmaet til Idé-Banken samt samlet beholdningsoversigt for vekselererfirmaet. Disse er i nøje overensstemmelse med det i øvrigt foreliggende. Parterne er enige om, at alle handler gennemført i vekselererfirmaets udlandsafdelings regi var ført elektronisk - med en selvstændig post for hvert papirnavn, hvorunder der var opført en »negativ beholdning« som værende beholdningen i vedkommende depotinstitut - her Ark - og »positive beholdninger« som værende kundernes depotbeholdninger hos vekselererfirmaet. Parterne er endvidere enige om, at vekselererfirmaets depotføring og regnskabsføring er foregået »på en pæn og betryggende måde for udenlandske aktier«. Parterne er desuden enige om, at vekselererfirmaet i tidsrummet fra sommeren 1987 og frem til konkurstidspunktet ikke har haft en egenbeholdning af EFACEC aktier. Parterne er endelig enige om, at der ved konkursens indtræden var 1.000 EFACEC aktier i vekselererfirmaets depot hos Ark, og at 500 var registreret i vekselererfirmaets beholdningsoversigt som tilhørende Idé-Banken, 500 som tilhørende Bendix Bank, som heller ikke havde noteret sub-accounts på de udenlandske aktier. Parterne har oplyst, at Amagerbanken - som i mellemtiden havde overtaget Bendix Bank - »har fået udleveret sine 500 aktier, som de fik separatiststilling til i henhold til afsagt dom, som er endelig«.

Appellanten har anført, at der foreligger en opbevaringsaftale i form af depositum regulare, idet vekselererfirmaet i forhold til Idé-Banken var uberettiget til at råde over de opbevarede aktier. Det er i den henseende uden betydning, at vekselererfirmaet over for Ark har stået som adkomsthaver til aktierne. Administrationsselskabet har herefter som ejer krav på udlevering af aktierne, eftersom det er muligt på betryggende måde at identificere disse i konkursboet, allerede fordi vekselererfirmaets depotregistrering angiver, hvor mange aktier den enkelte depothaver har liggende i depot.

Konkursboet har fastholdt, at Idé-Banken ikke er blevet ejer af aktierne, idet der ikke er sket behørig individualisering af aktierne, der lå i samledepot hos tredjemand. Hertil kommer, at vekselererfirmaets indkøb af udenlandske aktier og efterfølgende deponering ikke har karakter af depositum regulare.

**Højesterets bemærkninger.**

Efter aftalerne mellem Idé-Banken og vekselererfirmaet L. Pedersen I/S skulle vekselererfirmaet som kommissionær indkøbe EFACEC aktierne til banken. Indkøbene skete gennem det engelske børsmæglerselskab Ark Securities, den portugisiske bank Banco Espirito og bankens mægler på den portugisiske børs, og aktierne blev indlagt i Ark's depot hos Banco Espirito. De indkøbte aktier blev herved Idé-Bankens ejendom, jf. kommissionslovens § 53, stk. 2.

I hvert fald i et tilfælde som det foreliggende, hvor vekselererfirmaets samledepot hos Ark ikke indeholdt EFACEC aktier tilhørende vekselererfirmaet selv, er det ikke afgørende for administrationsselskabets adgang til at hæve dets ejendomsret over for konkursboet, at Idé-Bankens aktier blev indlagt i depotet sammen med EFACEC aktier tilhørende andre kunder hos vekselererfirmaet uden angivelse af tilhørsforholdet. Den nødvendige påvisning som grundlag for udtagelse af det antal EFACEC aktier, som tilhører administrationsselskabet, kan ske i overensstemmelse med den foretagne - pålidelige - bogføring hos vekselererfirmaet, jf. herved lov nr. 1072 af 20. december 1995 om værdipapirhandel m.v. § 6, stk. 3 og 4.

Herefter tager Højesteret appellantens påstand til følge.

## Thi kendes for ret:

*Indstævnte, Fondsbørsvekselerer L. Pedersen I/S under konkurs ved kuratorerne, advokaterne Pernille Bigaard, Peter Bøgelund og Steen Klein, skal til Administrationsselskabet af 2. april 1990 A/S udlevere 500 stk. EFACEC Emp Fabrie de Maquinas Elec aktier og 133 stk. AC. Amper Abr 87 aktier samt betale de under konkursbehandlingen oppebårne udbytter af disse aktier, alt mod administrationsselskabets betaling til indstævnte af 458.393,79 kr. med procesrentefra den 21. september 1990.*

*I delvise sagsomkostningerfor landsret og Højesteret skal indstævnte til Finansrådet som mandatar for administrationsselskabet betale 40.000 kr.*

*Dommen skal opfyldes inden 14 dage efter dens afsigelse.*