# Exhibit 1, Part 5

back and say "Okay, we will seek custodial approval in the meantime (34 emails)."[259] Significantly, the brokers did not have to actually seek the liquidity. Rather, it was pre-ordained that the broker would "find liquidity" for every single trade order from the Plans but in reality, since the entire transaction was pre-ordained, the so called "liquidity" was already in place.

209.  Step 9 says "Take forward price and put into **premade** email to be sent to the forward counterparty (34 emails)."[260] Further, a template of this premade email is included within Step 9 of the instructions in Figure 34 below.

---

[259] Klugman Exhibit 1777.
[260] Klugman Exhibit 1777.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 81

> 2) Broker responds back via email and say will seek liquidity, get custodial approval (34 emails)
> 3) We respond back and say ok, we will seek custodial approval in the meantime (34 emails)
> 4) Upload spreadsheet to TAS with corresponding account numbers **ONLY AFTER ALL BROKER RESPONSES**
>    a. Deadline to hear back from ALL brokers is 1hr before market close before uploading spreadsheet to TAS
> 5) Receive email from system saying "Submission Acknowledged" (1 email)
> 6) Wait for market to close
> 7) At market close, get skype message from Pogo on accurate closing price and forward price and confirm pricing
> 8) Broker also sends closing price (34 emails)
> 9) Take forward price and put into **premade** email to be sent to the forward counterparty (34 emails)
>
> Hope all is well.
>
> We are looking to enter into the following physically settled OTC forward.
>
> SELL ▇▇▇▇▇ - 20th June 2014 expiry - PNDORA DC @ dkk ▇▇▇▇▇▇
>
> Please let me know if this works for you.
>
> 10) Receive email from forward counterparty confirming price (34 emails)
>     a. We respond to forward counterparty "Okay, we will now seek approval."
> 11) Go to TAS, add price for forward contract, will get TAS acknowledgement for all 34 funds (1 email from Old Park Lane)
> 12) Within 1-2hrs you receive approval for both trades (Each account gets 2 approval emails, 1 for stock and 1 for forward from Old Park Lane, for a total of 64 emails)
> 13) After Old Park Lane approval, broker will email on stock saying its approved with custodian and sends confirms to follow

**Figure 34 – Trading Instructions**[261]

210. The instructions further state that the Plans' representatives should "prepare loan documents 34 times (cash collateral is price x shares)" as of T+2 (referring to two days after the purported purchase of the stock).

211. Then on T+3, the Plans' representatives were instructed to "look for email for stock borrow, times will vary but should be early AM EST." According to Markowitz, this meant

---

[261] Klugman Exhibit 1777.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 82

that the Plans were to expect the stock lending counterparty to send an email to the Plans.[262] However, what is not clear is how the stock lending counterparties—if they were truly third parties not affiliated with Solo Capital—would know on each occasion to reach out to the pension plans to see if there was interest for a stock loan, and in the exact amount that the Plan happened to purchase.

> **T+1**
>
> 14) By next day, broker should have sent confirm by now, electronically we will sign forward contract through TAS
>
> **Stock Borrow**
>
> **T+2**
>
> 1) Prepare loan document 34 times (cash collateral is price x shares)
>
> **T+3**
>
> 2) Look for email for stock borrow, times will vary but should be early AM EST
> 3) We respond "yes we have an interest, please see attached terms (attach term sheet) and if acceptable we will seek approval from our Custodian now"
> 4) Borrower will respond with a yes/no and say please seek approvals.
> 5) We Respond "will seek approval"
> 6) Go into TAS to seek approval (upload spreedhseet)
> 7) Wait for approval from Old Park Lane in email (34 emails)
> 8) Done

**Figure 35 – Trading Instructions**[263]

212.  The above email from Klugman—which memorializes the step-by-step instructions on how to execute the purported transaction—illustrates how these transactions were all pre-arranged by Solo Capital and Shah. In fact, they literally directed the various entities to send emails using email templates that were provided by Klugman, with the missing information to be filled in as instructed for each respective transaction. Further, they selected the specific securities, set out the terms, the allocations for each plan, the prices, the trade dates, and the

---

[262] Deposition of Richard Markowitz, Vol. 2, 425:4-425:25.
[263] Klugman Exhibit 1777.

counterparties—everything was orchestrated in advance by Solo Capital on behalf of the Plans. The "brokers" invariably filled each and every "order" as per Solo Capital's direction because they did not actually go into the market to obtain real shares.

### F. The Plans did not have sufficient capital, liquidity or access to real credit to complete the purported Solo Trades but for the circular nature of the structured scheme

213. Based upon a review of available records and bank statements, the LLC sponsors of the Plans had limited, if any, legitimate business operations and were, at best, thinly capitalized, with opening bank balances of typically only a few thousand dollars or less.[264] As a result, the LLC sponsors of the Plans typically had little if any money to contribute to the Plans, or to pay salary to the plan participants from which the participants could contribute to the Plan.

214. Not surprisingly, the newly formed 401(k) plans created by these closely held LLCs were also thinly capitalized, as few contributions were made to the Plans. As a result, the Plans lacked the liquidity and financial wherewithal necessary to purchase the shares that were supposed to be the subject of the Solo Trades and which were worth hundreds of millions of dollars in certain instances.[265]

215. The purported trades executed by the Plans were all structured to appear as over-the-counter ("OTC") trades.[266] Despite the Plans not having the financial wherewithal to execute trades in the hundreds of millions of dollars, nor the credit history to back up such trades, nevertheless the trades were filled nearly instantaneously (see *e.g.* discussion *infra* on the sample Solo Trades purportedly executed by the Bernina Plan and the Loggerhead Plan). The Plans' ability to instantaneously and repeatedly obtain financing through the stock loans, notwithstanding the Plans' complete lack of creditworthiness, is further evidence that the purported purchases of securities were not real. Consistent with this pattern, it appears that the offshore stock loan counterparties such as Neoteric Limited were also thinly capitalized and would not have had capital to use as the cash collateral component of the stock loan

---

[264] *See*, for example TD_0001381-1445 (Ackview LLC); JPM00000198-282 (Blackrain Pegasus LLC); OCEANFIRST_00001573-1642 (Oaks Group LLC).
[265] See Exhibit 3
[266] OTC means that investors engage in transactions with each other through informal networks rather than on a centralized exchange like the Copenhagen Stock Exchange.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 84

transactions.

### G. The Trading Pattern At North Channel Bank Is Consistent With The Solo Trades

216. Two of the Plans that participated in the Solo Trades also participated in similarly structured trades at another custodian bank, North Channel Bank ("NCB"). In the Spring of 2014, the two Plans, the Omineca Pension Plan ("Omineca") and Vanderlee Technologies Pension Plan ("Vanderlee") participated in 5 and 6 structured trades, respectively, at NCB.[267]

217. Current management of NCB performed an investigation of tax vouchers issued by NCB on behalf of various U.S. pension plans for the purpose of submitting refund claims to SKAT. According to Gunnar Volkers, a current managing director at NCB, each of the tax vouchers issued for the Omineca and Vanderlee Plans was false.[268] Mr. Volkers confirmed that the Plans' structured trades at NCB were "circular" and "designed" to create a "closed shop" in that all participants in the trades were customers of NCB.[269] Because of this design, NCB held no shares on behalf of the Plans (or any of its other customers) as a result of the trades, and the purported shareholdings on the NCB-issued tax vouchers were "fictitious."[270] Since there were never "any real shares," Mr. Volkers further confirmed, NCB never received "any real dividend payment" on behalf of the Plans (or any of its other customers), and the NCB-issued tax vouchers did not reflect "real money credited to the account."[271] In September 2019, NCB pleaded guilty to "collusive serious fraud against the Danish state," which fraud included the structured trades at NCB in which the Omineca and Vanderlee Plans participated.[272] Mr. Volkers' testimony regarding the purported trading through NCB is consistent with my analysis and conclusions for the Solo Trades.

---

[267] SKAT_MDL_001_00060281 (Omineca) ; SKAT_MDL_001_00059631 (Vanderlee).
[268] Volkers Tr. at 13:18-14-1, 19:16-45:8.
[269] *Id.* at 19:21-20:17, 76:17-77:14.
[270] *Id.* at 54:11-57:2.
[271] *Id.* at 56:18-59:5.
[272] *Id.* at 71:2-75:18.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 85

## VII. OPINION NO. 2: THE SOLO TRADES GENERATED MILLIONS IN WITHHOLDING TAX REFUNDS, BUT THE PLANS WERE LEFT WITH ONLY A FRACTIONALLY SMALL AMOUNT OF THE TOTAL REFUNDS PAID BY SKAT

218. I performed a forensic accounting analysis of the subsequent cash flows of tax refund payments that were paid by SKAT to payment agents acting on behalf of the Plans. Setting aside fees provided to payment agents and purported "trading fees" (which together generally make up approximately 2% of the refund payments), the payments were distributed to three categories of recipients.

219. The first recipient is Ganymede Cayman Limited ("Ganymede"), an offshore Cayman Islands entity that invoiced the Plans for the majority of the refund amounts. Ganymede was essentially an alter-ego of Solo, owned and controlled by Shah.[273] In fact, many of Ganymede's invoices directed the Plans to make Ganymede's payments to a Solo Capital bank account.[274]

220. The second category of recipients are "Recruiters." These individuals, which include Richard Markowitz, John van Merkensteijn, Robert Klugman, Doston Bradley, Matthew Tucci, Roger Lehman, and Gavin Crescenzo, recruited others to establish pension plans that would then submit tax refund claims to SKAT.

221. After the payments to Ganymede and its affiliates, these Recruiters received a large majority (often over 90%) of the remaining share of the refund payments generated by the Plans they had helped establish. In the case of Markowitz, van Merkensteijn, and Klugman, these payments were made by establishing the partnership arrangements referenced in Section V.A above, in which the Plans paid entities controlled by Markowitz, van

---

[273] Deposition of Richard Markowitz dated April 8, 2021, 200:24-201:13. Sanjay Shah was the shareholder of Ganymede from September 20, 2011 until he transferred the share to Elysium Global Limited, another entity he controlled, on July 11, 2014 (CN012_318_001-00000042; ELYSIUM-05295222). He also acted as a director of Ganymede, as did Sanjeev Dave, Graham Horn, Rajen Shah, Guenther Grant-Klar (CN012_322_001-00000001 at 76), who were all also associated with Solo (ELYSIUM-00150387).

[274] *See*, for example:

- Invoice from Ganymede to Ackview LLC Solo 401k Plan provides "Solo Bank Details" (ACKVIEW00000199). The account number listed, 64338333, is a Barclays client money account held by Solo (SCPADMINISTRATORS_00003319).

- Invoice from Ganymede to The DMR Pension Plan provides "Solo Bank Details" (DMR00000317). The account number listed, 64105155, is a Barclays currency account held by Solo (SCPADMINISTRATORS_00004660).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 86

Merkensteijn, and Klugman. Lehman, Bradley, Tucci, and Crescenzo did not use a partnership structure. Instead, they set up shell entities to receive the majority of their payments. The shell entities were paid by Solo itself, which routed the funds through Ganymede and other offshore entities controlled by Shah.

222. The third category of recipients are the Plans themselves and/or the individual Plan participants. The Plans associated with these individuals received a miniscule portion of the tax refund payments submitted on their supposed behalf, with some Plans and/or Plan participants receiving no payment at all.

223. The payments ultimately retained by these Plans were significantly less than those retained by Plans established by some Recruiters, such as Markowitz, van Merkensteijn, and Klugman. This latter category received a larger share of the refund payments (though still less than what Solo pocketed).

224. In performing the cash flow analysis, I also observed that the only payments to the Bellwether Plans from the Solo Trades were from tax refund payments by SKAT. There were no cash flows to the Plan's bank accounts resulting from the receipt of any actual dividends or from any profits related to the purported trading.

    A.    **Ganymede/Solo**

225. SKAT's payments of tax refunds to the Plans were first sent to various Payment Agents, who had submitted applications on behalf of the Plans. After taking their fee (typically less than 1% of the refund), the Payment Agents typically transferred the rest of the funds to the Solo Custodians, where the funds were deposited in the Plans' accounts. The majority of the tax refunds were then disbursed from these accounts for payment of invoices generated by Ganymede.

226. According to Ganymede's invoices, the payments by the Plans were in exchange for "fees due under services agreement."[275] The invoices provide no further detail on the supposed services Ganymede was providing that warranted such a large share of each tax refund payment. I have also reviewed various Tax Reclaim Advisory Services Agreements between the Plans and Ganymede. The Agreements are similarly vague regarding the actual

---

[275] See, for example, Invoice from Ganymede to Roadcraft dated July 7, 2015 (MPSKAT00010288).